**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INTEGRA LIFESCIENCES CORP., INTEGRA LIFESCIENCES SALES LLC, CONFLUENT SURGICAL, INC., and INCEPT LLC,

Plaintiffs,

v.

HYPERBRANCH MEDICAL TECHNOLOGY, INC.,

Defendant.

Civil Action No. 15-819-LPS-CJB

**MEMORANDUM ORDER**

Presently pending in this patent infringement case is Defendant HyperBranch Medical Technology, Inc.'s ("Defendant" or "HyperBranch") letter motion to strike portions of Plaintiffs Integra LifeSciences Corp., Integra LifeSciences Sales LLC, Confluent Surgical, Inc. and Incept LLC's (collectively, "Plaintiffs") expert report offered by Plaintiffs' damages expert, John C. Jarosz (the "Motion"). (D.I. 345)[1] The portions of Mr. Jarosz's report at issue are those that provide a basis for seeking damages in the form of lost profits based on: (1) price erosion; and (2) market share apportionment. For the reasons set forth below, the Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion.

[1] Our Court has treated motions to strike as non-dispositive motions, which may be resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2). *See, e.g., Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *1 n.1 (D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 987 n.1 (D. Del. 2013) (citing cases). This is in line with decisions of other courts in this Circuit, which have also treated such motions as non-dispositive, at least where the ultimate decision was not determinative of a party's claims (just as the decision is not here). *See, e.g., Hawkins v. Waynesburg Coll.*, Civil Action No. 07-5, 2007 WL 2119223, at *1 n.1 (W.D. Pa. July 20, 2007); *Reedy v. CSX Transp., Inc.*, Civil Action No. 06-758, 2007 WL 1469047, at *1 n.1 (W.D. Pa. May 18, 2007).

## I. BACKGROUND

### A. Procedural Background

Plaintiffs filed the instant case on September 15, 2015. (D.I. 1) Plaintiffs allege that HyperBranch directly and indirectly infringes the six asserted patents (directed to biocompatible crosslinked polymers, i.e., hydrogels, having certain features and methods for their preparation and use) by the manufacture, sale, and offers to sell of products including its Adherus AutoSpray Dural Sealant, Adherus Dural Sealant and Adherus Spinal Sealant. (D.I. 1 at ¶¶ 11-16, 28, 35, 42, 49, 56) The parties are direct competitors in the dural sealant market, as they are the only two FDA-approved suppliers in that market. (*See, e.g.*, D.I. 164 at 5, 29-30) Plaintiffs' competing dural sealant product is known as "DuraSeal." (*See, e.g.*, *id.* at 5)

On September 25, 2015, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (D.I. 15) After a lengthy preliminary injunction stage, the Court recommended denial of Plaintiffs' request for a preliminary injunction, (D.I. 164), and a schedule for the remainder of the case issued soon after, (D.I. 173). Fact discovery closed on May 26, 2017. (D.I. 278 at 5)

Pursuant to multiple Court-ordered amendments to the expert-related deadlines (all issued at the parties' joint requests), opening expert reports were due on September 8, 2017; rebuttal reports were due on October 2, 2017, and reply reports were due on October 13, 2017. (D.I. 322) Expert discovery closed on November 10, 2017, (D.I. 374), with dispositive motions due three weeks later, on November 21, 2017, (D.I. 322). A pre-trial conference is scheduled for April 6, 2018, and trial is to begin on April 16, 2018. (D.I. 173 at ¶ 24; July 28, 2017 Oral Order)

### B. Factual Background

On September 9, 2016, Plaintiffs served Defendant with their Initial Identification of Asserted Patents, Accused Products, and Damages Model, in which they stated as part of their Initial Identification of Damages Model that for certain alleged infringement, they would seek "lost profits (including a price erosion component) to the extent that those lost profits are not less than a reasonable royalty." (D.I. 359, ex. A at 2) Two weeks later, on September 23, 2016, Defendant served Plaintiffs with its First Set of Interrogatories, which included an interrogatory seeking Plaintiffs' damages contentions as follows (hereinafter, the "first damages Interrogatory request"):

> INTERROGATORY NO. 5 [13]. Describe in detail the amount, method of calculation, and all facts and evidence supporting any calculation for any damages You claim in this Action, and specifically identify and explain the damages suffered by each particular Plaintiff.

(D.I. 346, ex. B at 14) On October 27, 2016, Plaintiffs filed their Objections and Answers to these interrogatories, and in response to Defendant's first damages Interrogatory request, they stated, *inter alia*:

> OBJECTION AND ANSWER TO INTERROGATORY NO. 5 [13]:
> . . . Plaintiff[s] further object to this Interrogatory as seeking information that is properly the subject of expert discovery and expert testimony in advance of the schedule set for the disclosure of expert reports and expert discovery as set forth in the Scheduling Order entered by the Court. Plaintiffs reserve the right to supplement this response to identify additional information and/or documents as more facts arise in discovery in accordance with the Rules. . . . For infringement in the United States, the monetary damages that only encompass a small portion of the total harm suffered by plaintiffs and would be equal to *at least plaintiff[s]'[] lost profits (or no less than a reasonable royalty)*[.]

(*Id.* at 14-15 (emphasis added))

Defendant was not satisfied with this response, and the parties had a meet-and-confer to "clarify Plaintiffs' position[]" with respect to Defendant's first damages Interrogatory request. (D.I. 346 at 1) Following up on that meet and confer, Defendant's counsel wrote a letter to Plaintiffs' counsel on November 2, 2016, asserting that, with respect to Defendant's first damages Interrogatory request, Plaintiffs stated during the meet-and-confer that "as of November 1, 2016, Plaintiffs have no factual evidence of any lost profits due to actual sales that were allegedly lost to sales by HyperBranch. Rather, Plaintiffs are relying solely on the theory that the relevant market is only a 'two party' market and that such lost sales are presumed under such circumstances." (*Id.*, ex. C at 2) Two days later, Plaintiffs responded by letter as follows:

> With respect to [Defendant's first damages Interrogatory request], your statement that Plaintiffs have no factual evidence of lost profits is an inaccurate summary of Plaintiffs' statements during the meet and confer. Specifically, Plaintiffs informed you that *it is their current understanding that the relevant U.S. market at issue in this case is a two party market. In a two party market, lost sales are presumed, such that each sale made by the accused infringer is a potential sale lost by the patent owner.* From that perspective, much of the evidence of lost sales is likely to be found in HyperBranch's own sales records. As Plaintiffs further informed you, and as set forth in their response to [Defendant's first damages Interrogatory request], that this interrogatory is directed to information that is properly the subject of expert discovery and Plaintiffs will provide the requested information consistent with the dates in the Court's Scheduling Order for the disclosure of expert reports and expert discovery.

(*Id.*, ex. D at 2 (emphasis added)) Plaintiffs never supplemented or amended their response to Defendant's first damages Interrogatory request. (*See* D.I. 346 at 1)

Towards the end of the fact discovery period, on April 26, 2017, Defendant served three additional interrogatories to Plaintiffs directed to ascertaining additional facts relevant to

Plaintiffs' damages theories.  (*Id.*, ex. E at 11-17)  In particular, Defendant requested that

Plaintiffs:  (1) "[i]dentify all products which compete with [] DuraSeal"; (2) describe in detail the

facts and evidence supporting Plaintiffs' "assertion that the relevant market for purposes of

[Plaintiffs'] infringement allegations and/or damages claim comprises the DuraSeal and the

Accused Products to the exclusion of any other products"; and (3) describe in detail each sale

Plaintiffs claim to have lost as a result of HyperBranch's alleged infringement.  (*Id.* at 11-14)

   In response to each of these three interrogatories, on May 26, 2017 (the last day of the

fact discovery period), in addition to making objections, Plaintiffs affirmed their reliance on facts

demonstrating that the relevant market was a two-party market.  (*Id.* at 12 ("Plaintiffs rely on

facts and evidence (including those identified in the previously served and future declarations of

Mr. John Jarosz) that show that the appropriate U.S. market for DuraSeal[] products is the

market for synthetic dural sealants approved for use in cranial and/or spinal procedures.  In the

U.S. market, the only known approved products that compete with DuraSeal[] are the Adherus

AutoSpray Dural Sealant (NUS-106) and Adherus AutoSpray Extended Tip (ET) Dural Sealant

(NUS-109)."); *id.* at 14 ("Plaintiffs rely on facts and evidence . . . that show that the market for

FDA approved synthetic dural sealants for use in cranial procedures in the United States is

limited to DuraSeal[] and the Adherus AutoSpray Dural Sealant (NUS-106) and Adherus

AutoSpray Extended Tip (ET) Dural Sealant (NUS-109)."), *id.* at 16 ("Plaintiffs rely on facts and

evidence . . . that show that each sale of the Adherus Autospray Dural Sealant (NUS-106) and

Adherus Autospray Extended Tip (ET) Dural Sealant (NUS-109) in the United States is a lost

sale of the DuraSeal[] product."))  Plaintiffs never amended or supplemented these responses

either.

On September 8, 2017, Plaintiffs served Mr. Jarosz' damages expert report, (D.I. 329), which itself is dated August 25, 2017, (D.I. 346, ex. A (hereinafter, "Jarosz Report")). The Jarosz Report asserts that Plaintiffs are entitled to lost profits based on: (1) price erosion; and (2) market share apportionment based on synthetic sealants being used "much more frequently than non-synthetic sealants" in "certain types of surgeries[.]" (*See* Jarosz Report at ¶¶ 8, 10, 90-137, 318 and 320) With respect to Plaintiffs' price erosion theory, Mr. Jarosz calculated Plaintiffs' lost profits damages from price erosion as corresponding to the amount of additional profit Plaintiffs would have made on DuraSeal sales in the United States for which prices were eroded due to infringing competition by Defendant's products—an amount of [redacted] through March 2017, and [redacted] through April 2018. (*Id.* at ¶ 320) With respect to Plaintiffs' market share apportionment theory, Mr. Jarosz acknowledged in his report that some purchasers of Defendant's accused products in the relevant time period would *not* have purchased DuraSeal had the accused products been unavailable; he allowed that some of those sales would have been replaced by the purchase and use of fibrin glue, a non-synthetic sealant. (*Id.* at ¶¶ 100, 103, 113, 114) Mr. Jarosz then calculated Plaintiffs' lost profits damages for lost sales as corresponding to the amount of profit that Plaintiffs would have made on DuraSeal sales in the United States that were displaced by Defendant's products—an amount of between [redacted] through April 2017, and between [redacted] through April 2018. (*Id.* at ¶ 318) With respect to any infringing sales upon which Plaintiffs do not receive lost profits, Mr. Jarosz calculated reasonable royalty damages in the amount of [redacted] through April 2017, and [redacted] through April 2018. (*Id.* at ¶ 319)

On September 29, 2017, Defendant filed the instant Motion. (D.I. 345) With it,

Defendant requested that the Court strike Mr. Jarosz's analysis of and the conclusions drawn from the price erosion and market share apportionment theories set forth in his report, and that the Court preclude Plaintiffs from presenting these theories at trial. (D.I. 346 at 3)[2] On October 25, 2017, the Court held telephonic oral argument on the Motion. (D.I. 377 (hereinafter, "Tr."))

## II. LEGAL STANDARD[3]

Federal Rule of Civil Procedure 26 imposes a continuing obligation to timely supplement or correct discovery disclosures, requiring that "[a] party who has . . . responded to an interrogatory . . . must supplement or correct its . . . response: (A) in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A) & (B). "If a party fails to provide information or identify a witness [in the manner required by Rule 26], the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Additionally, pursuant to Federal Rule of Civil Procedure 16(f), the court may impose sanctions

---

2 Specifically, Defendant requests that the Court strike paragraphs 8, 10, 90-137, 318 and 320 of the Jarosz Report. (D.I. 346 at 3) Paragraphs 8, 90–121 and 318 relate to Plaintiffs' market share apportionment theory. (*Id.*, ex. A) Paragraphs 10, 122-137 and 320 relate to Plaintiffs' price erosion theory. (*Id.*)

3 Because the discovery matters at issue here are not unique to patent law, the law of the United States Court of Appeals for the Third Circuit applies. *See INVISTA N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *1 (D. Del. June 25, 2013) (citation omitted); *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (citing *Micro Chem, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)).

(such as the exclusion of expert testimony), including those authorized by Rule 37(b)(2)(A),[4] if, *inter alia*, a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C); *see also INVISTA N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *2 (D. Del. June 25, 2013).[5]

Although a court clearly has the authority to strike an expert report and/or exclude evidence (such as expert testimony) pursuant to Rule 37, it should be mindful that because "[t]he exclusion of critical evidence is an extreme sanction," such a remedy should not be imposed where an untimely or improper disclosure amounts to only a "slight deviation from pre-trial notice requirements" or occasions only "slight prejudice" to the movant. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted). Instead, exclusion should be reserved for circumstances amounting to "willful deception or flagrant disregard of a court order by the proponent of the evidence." *Id.* at 792 (internal quotation marks and citations omitted); *see also Bridgestone Sports Co., Ltd. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (noting that while the decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or

---

[4] Under Rule 37(b)(2)(A)(ii), if a party "fails to obey an order to provide . . . discovery . . . the court . . . may . . . prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" Fed. R. Civ. P. 37(b)(2)(A)(ii); *see also Meyer v. Callery Conway Mars HV, Inc.*, Civil Action No. 2:13-cv-00109, 2015 WL 65135, at *16 (W.D. Pa. Jan. 5, 2015).

[5] If portions of an expert report are stricken, that action effectively precludes the expert from testifying as to the subject matter and opinions contained in those portions of the report. *See, e.g.*, *Withrow*, 967 F. Supp. 2d at 1000; *see also Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 615 (D. Del. 2007).

inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered"); *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005) (finding that although "the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure [that] should be avoided where possible[,]" it can be appropriate to prevent against the "flouting of discovery deadlines[,]" so as to maintain "fidelity to the constraints of Scheduling Orders and deadlines[, which] is critical to the Court's case management responsibilities") (internal quotation marks and citations omitted), *rev'd on other grounds*, 543 F.3d 1306 (Fed. Cir. 2008).

In considering whether to exclude evidence relating to an untimely or otherwise improper disclosure, the United States Court of Appeals for the Third Circuit has directed district courts to weigh certain factors, known as "the *Pennypack* factors": (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the testimony sought to be excluded. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).

## III. DISCUSSION

Below, the Court will first assess Defendant's Motion as it relates to Plaintiffs' disclosure of their lost profits theory relating to price erosion. Second, the Court will turn to Plaintiffs' disclosure of their lost profits theory relating to market share apportionment.

### A. Price Erosion

Price erosion damages "fall under the lost profits umbrella." *See Global Traffic Techs., LLC v. Emtrac Sys., Inc.*, Civ. No. 10-4110 (ADM/JJG), 2012 WL 12899092, at *3 (D. Minn. Dec. 20, 2012) (internal quotation marks omitted); *see also* (Tr. at 10). A lost profits claim based on a theory of price erosion "essentially alleges that due to the low sales price by the infringer, the patentee was forced to lower its sales price to stay competitive." *Syngenta Crop Protection, LLC v. Willowood, LLC*, Civ. No. 16-mc-171-RGA, 2016 WL 4925099, at *3 (D. Del. Sept. 14, 2016); *see also W.R. Grace & Co.—Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 327 (D. Del. 1999). For the reasons set out below, the Court finds that Plaintiffs did not untimely disclose the price erosion component of their claim for lost profit damages.

At the beginning of the discovery period in this case (following the preliminary injunction phase), on September 9, 2016, Plaintiffs expressly informed Defendant that they intended to seek "lost profits (including a price erosion component)." (D.I. 359, ex. A at 2) To be sure, were it not for the fact of this (admittedly sparse) initial disclosure, Plaintiffs' lost profits theory based on price erosion would stand on shaky ground. This is because Plaintiffs' subsequent response to Defendant's first damages Interrogatory request approximately six weeks later (which was never supplemented) did not specifically mention price erosion, instead broadly referencing only "lost profits" or a reasonable royalty. Indeed, Plaintiffs failed to cite to *any* facts or evidence in support of their claim for "lost profits (or no less than a reasonable royalty)" in that response. (D.I. 346, ex. B at 15)

But Plaintiffs *did* make that initial disclosure, and that has to count for something here. Defendant was aware of the disclosure. And so, when Defendant then saw Plaintiffs' response to Defendant's first damages Interrogatory request, there was good reason for Defendant to believe

that when Plaintiffs were there referencing their plan to seek "lost profits" in the case, they were referring to a plan to seek, *inter alia*, price erosion damages. If Defendant was unsure of whether that was still Plaintiffs' plan after receiving Plaintiffs' response to the first damages Interrogatory request, or if Defendant believed that Plaintiffs' response did not otherwise shed sufficient light on the substance of their price erosion theory, then Defendant had options. It could have pressed Plaintiffs to provide more detail by way of a further response on the price erosion issue.[6] And, were it not satisfied with Plaintiffs' answer, Defendant could have moved to compel a more complete response with regard to that issue.

There is little question in the Court's mind that if Defendant *had* brought that kind of motion to compel, the Court would have granted the motion. After all, the first damages Interrogatory request asked Plaintiffs to describe "in detail . . . all facts and evidence supporting any calculation for any damages" Plaintiffs were seeking. (D.I. 346, ex. B at 14) And Plaintiffs' response contained reference to basically no facts or evidence at all. That is unacceptable, and it is a failing that would have been remedied had Defendant promptly sought such a remedy. *See, e.g., GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, D.I. 101 at 1-2 (D. Del. Jan. 28, 2016) (granting a motion to compel a supplemental response to defendant's interrogatory relating to plaintiff's claim for lost profits damages that "shall amount

---

[6] The record does demonstrate that Defendant engaged in a further meet-and-confer with Plaintiffs after receiving Plaintiffs' response to the first damages Interrogatory request. But it appears that the focus of Defendant's frustration in that meet-and-confer was on Plaintiffs' failure to elaborate and provide evidence in support of their theory of lost profits *from lost sales*. That is what Defendant seems to have inquired about during the meet and confer, leading Defendant to later write to confirm that Plaintiffs' lost sales-related theory was that "the relevant market is only a 'two party' market[.]" (D.I. 346, ex. C at 2) It does not appear that Defendant ever specifically followed up on Plaintiffs' initial, express disclosure that Plaintiffs' lost profits theory of damages would include a price erosion component. (*See* Tr. at 14-15)

to a meaningful articulation of the bases for [plaintiff's] contention that it is entitled to such damages" and include "a narrative explanation as to how the information contained in [certain documents referenced in a supplemental response to the interrogatory] shed light on [plaintiff's] contention that it is entitled to lost profits damages").

But Defendant determined not to press the point further. Moreover, (and this is the key point here), because Plaintiffs *had previously disclosed* their plan to seek lost profits based on price erosion damages in September 2016, Defendant cannot now claim to be completely blind-sided by the fact that Plaintiffs' expert's report references that theory. Because of the fact of that prior disclosure, and Defendant's failure to follow up on it, this is one of those circumstances where: (1) it is true that Plaintiffs did not say much of anything in discovery on the topic, but (2) it is also true Defendant at least equally shares the blame for the fact that the discovery record is not more robust.

For these reasons, Plaintiffs did timely disclose their lost profits theory based on price erosion damages, and Defendant's Motion as it relates to that theory is DENIED. The facts relating to the other issue raised by Defendant, though, are very different. And they will compel a different outcome.

### B. Market Share Apportionment

Sometimes the patentee and accused infringer are the only suppliers in the market, and in such a circumstance, the patentee would typically seek to recover lost profits from every sale made by the infringer. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). That is because it can be reasonable to assume in this scenario (provided the patent owner has the necessary manufacturing and marketing capabilities) that the patent owner would have

made the infringer's sales. *Id.* In those instances, the application of the test for proving an entitlement to lost profits is "usually straightforward and dispositive." *Id.*; *see also Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) (referring to a "two-supplier market" lost profits theory as a "simple" one).

But the United States Court of Appeals for the Federal Circuit has also recognized that when there are multiple competitors in the market, a patentee may still prove entitlement to lost profits damages from an alleged infringer, by using a market share apportionment theory. *State Indus., Inc.*, 883 F.2d at 1577-78; *see also Micro Motion, Inc.*, 894 F.2d at 1322 (explaining that "litigants have been held entitled to lost profits damages calculated on a portion of an infringer's sales based on the patentee's market share"). A showing of entitlement to lost profits damages based on a market share appointment theory (or an accused infringer's efforts to contest such a showing) will necessarily be more complicated than reliance on the "straightforward" two-party market theory.

The Court agrees with Defendant that Plaintiffs had an obligation to disclose their market share apportionment theory well before they served Defendant with the Jarosz Report on September 8, 2017. It also agrees that Plaintiffs failed to fulfill this obligation. The Court will first explain why all this is so. Then it will examine how the *Pennypack* factors inform the decision as to whether evidence regarding the theory should be excluded.

### 1.    Timeliness of Plaintiffs' Disclosure of their Market Share Apportionment Theory of Lost Profits Damages

The Court here reaches a different conclusion with respect to the timeliness of Plaintiffs' disclosure of their market share apportionment theory than it did above with respect to Plaintiffs'

disclosure of their price erosion theory. This is because not only did Plaintiffs *never disclose* a market share apportionment theory, but they also instead disclosed (and repeatedly confirmed their reliance on) a theory that is in real conflict with that theory: "that the relevant U.S. market at issue in this case is a two party market." (D.I. 346, ex. D at 2; *see also, e.g.*, *id.*, ex. E at 11-17) And never until Defendant received Mr. Jarosz's report, served on September 8, 2017, was Defendant made aware that Plaintiffs' theory had changed. This was not a timely supplementation of Plaintiffs' damages theory regarding lost profits from lost sales.

Plaintiffs seem to assert two primary reasons why they were justified in doing what they did here. First, Plaintiffs note that in addition to stating their reliance on a two-player market theory in their interrogatory responses and related communications, they also: (1) objected that Defendant's damages-related interrogatories prematurely called for expert analyses, and (2) indicated that their responses "rely on facts and evidence (including those identified in the previously served and future declarations of Mr. John Jarosz)[.]" (D.I. 358 at 2-3 (internal citations omitted)) This, Plaintiffs assert, somehow excuses their failure to disclose facts relating to the market share apportionment theory until the Jarosz Report was served. (*Id.*) Second, Plaintiffs assert that their newly-disclosed theory "is consistent with the position that *Defendant* has taken throughout this litigation[,]" and that, as a result, it can be said that the information used by Mr. Jarosz was made known to Defendant during the discovery period in compliance with Federal Rule of Civil Procedure 26(e)(1)(A). (*Id.* at 3 (emphasis added))

Below, the Court will address why it disagrees with Plaintiffs on both points. And then it will further explain why Plaintiffs should have earlier supplemented the relevant interrogatory responses.

**a. Plaintiffs' Arguments are Not Persuasive**

**(1) Plaintiffs' Reason #1: The Requests were "Premature"**

Plaintiffs' first asserted reason why there was no discovery violation here is that the interrogatories prematurely called for expert analysis. But it is worth remembering that interrogatories (including those directed to exploring the basis for a patentee's claim for damages) serve a meaningful, significant purpose in a case like this. Indeed, the "purpose of contention interrogatories is to narrow and define issues for trial and to enable the propounding party to determine the proof required to rebut the respondent's position." *CIBA Vision Corp. v. Bausch & Lomb, Inc.*, Civil Action No. 2:99-CV-0034-RWS, 2003 WL 25774307, at *3 (N.D. Ga. Dec. 22, 2003) (internal quotation marks and citation omitted).[7]

The responding party's goal in answering interrogatories, then, should not be (as Plaintiffs suggested their goal was here) to (1) answer as "briefly" as possible, and then (2) simply rely on a later-filed expert's report, served after discovery closes, in order to disclose contrary positions. (Tr. at 48) Instead, Defendant was entitled to learn something about the facts

---

[7] *See also, e.g.*, *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012) ("Contention interrogatories . . . serve an important purpose in helping to discover facts supporting the theories of the parties. Answers to contention interrogatories also serve to narrow and sharpen the issues thereby confining discovery and simplifying trial preparation."); *Bayer Healthcare Pharms., Inc. v. River's Edge Pharms., LLC*, CIVIL ACTION FILE NO.: 1:11-cv-1634-HLM, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015) (explaining that the "entire point of [an] interrogatory request is to allow the propounding party to identify the facts and evidence the responding party intends to rely on for particular issues so that the propounding party can determine whether and how to proceed. Such interrogatory requests focus discovery and relieve the propounding party from having to guess or surmise which of the myriad of documents produced and legal theories available to the responding party the responding party intends to pursue"); *First Health Grp. Corp. v. United Payors & United Providers, Inc.*, No. 96 C 2518, 1999 WL 515499, at *1 (N.D. Ill. July 12, 1999) (explaining that the "whole purpose [of a damages contention interrogatory is] to get out on the table plaintiff's damages contentions so that defendant could explore them during the discovery period").

that Plaintiffs' damages expert would be relying upon prior to being served with the Jarosz Report, so that those facts could then be vetted in discovery. *See, e.g.*, *THX, Ltd. v. Apple, Inc.*, Case No. 13-cv-01161-HSG (DMR), 2016 WL 2899506, at *7-8 (N.D. Cal. May 13, 2016) (granting a motion to compel a supplemental response to a damages interrogatory where the plaintiffs' "disclosure and responses are insufficient, for they do not provide any specifics as to [the plaintiff's] basis for damages in this case" and because "[c]ourts in this district have compelled patent plaintiffs to provide the factual bases for their damages claim through initial disclosures and written discovery, over protestations that responsive information will be forthcoming through expert reports"); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, Civ. No. 09-MD-2118-SLR, Civ. No. 08-889-SLR, 2013 WL 12291705, at *1 (D. Del. Oct. 22, 2013) (explaining that while "the final calculation of damages is properly the subject of expert opinion. . . . experts must rely on facts for their opinions" and a party must disclose such facts in the course of fact discovery, *before* they are presented in expert reports); *Mobile Storage Tech., Inc. v. Fujitsu Ltd.*, No. C 09-03342 JF (PVT), 2010 WL 1292545, at *1 (N.D. Cal. Mar. 31, 2010) (granting defendant's motion to compel with respect to an interrogatory seeking the factual basis for plaintiff's damages claim and requiring plaintiff to "provide [*inter alia*] the factual basis for its damages claim [and] the identification of all facts to support its damages theories").[8] That did not happen here.

**(2) Plaintiffs' Reason #2: Reliance on Defendant's Position**

Plaintiffs' other asserted justification for their failure to supplement is that their newly

---

[8] *Cf. INVISTA N. Am. S.a.r.l.*, 2013 WL 3216109, at *5 (granting motion to strike new and untimely disclosed defense where such defense "alters the entire infringement and non-infringement landscape that was developed and vetted during fact and expert discovery").

disclosed market share apportionment theory "is consistent with the position that *Defendant* has taken throughout this litigation" and that therefore the information used by Mr. Jarosz was "made known to Defendant during the discovery process." (D.I. 358 at 3 (emphasis added)) However, a party's duty to supplement discovery responses set out in the Rules would be meaningless if a party could later simply point to cherry-picked information produced by its *opponent* as fulfilling the party's duty. *Cf. Hologram USA, Inc. v. Pulse Evolution Corp.*, Case No. 2:14-cv-00772-GMN-NJK, 2016 WL 3965190, at *2 (D. Nev. July 21, 2016) (explaining that Rule 26(e) "is not a loophole through which a party who . . . wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has long passed") (internal quotation marks and citations omitted).[9] As noted above, Federal Rule of Civil Procedure 26(e)(1)(A) requires a party to

---

9 Plaintiffs cite to two cases in support of the proposition that "[r]esponses to any interrogatories seeking factual information used by Mr. Jarosz in reaching his opinions were clearly supplemented and that information was disclosed in accordance with Fed. R. 26(e)(1)[,]" (D.I. 358 at 4), but the cited cases are distinguishable from the facts at hand. In *Marical, Inc. v. Cooke Aquaculture Inc.*, 1:14-cv-00366-JDL, 2017 WL 3812866 (D. Me. Aug. 31, 2017), the court denied the motions to strike at issue where the late disclosures did not "fundamentally change" the expert's opinion and "do not involve unfair surprise[.]" 2017 WL 3812866, at *2-3. Here, in contrast, the Court is sympathetic to Defendant's claim of surprise where Plaintiffs repeatedly disclosed in discovery a theory that is in real conflict with a theory found in their expert report. And in *Baltimore Aircoil Co., Inc. v. SPX Cooling Techs. Inc.*, Civil No. CCB-13-2053, 2016 WL 4426681 (D. Md. Aug. 22, 2016), the Court found that deposition testimony that had identified a potential witness amounted to sufficient supplementation under Rule 26(e)(1), and put the defendant on notice that this witness (who had not previously been mentioned as a person with knowledge of the subject matter in plaintiff's prior discovery responses) indeed had relevant information. 2016 WL 4426681, at *21-22. That scenario is a far cry from relying on a completely different theory of damages for the first time in an expert report, which is what is now before the Court. (D.I. 365 at 2 n.2) Indeed, in the same opinion, the *Baltimore Aircoil* Court excluded the patentee's late disclosed opinion on the doctrine of equivalents, explaining that the untimely disclosure "deprived [defendant] of the opportunity to conduct meaningful discovery on this new theory of infringement" and "[a]llowing [the plaintiff] to advance this position after the close of fact discovery would significantly prejudice [defendant]." 2016 WL 4426681, at *16-

supplement or correct an interrogatory response in a timely manner if the party learns that the response is incorrect, and if the additional or corrective information "has not otherwise been *made known to the other parties* during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). It makes no sense (as Plaintiffs attempt to do here) to point to *HyperBranch*'s expert's declaration and deposition, documents produced by *HyperBranch*, and *HyperBranch's* questions to Plaintiffs' Rule 30(b)(6) deponent as the portions of the record that fairly made it known that *Plaintiffs* would be taking the position that there were more than two choices in the relevant market. (D.I. 365 at 1-2) A party cannot be expected to fairly understand what an opponent's position will be by being required to look inside its own mind for the answer.

**b. Plaintiffs Should Have Earlier Supplemented Their Interrogatory Responses Relating to Damages**

Ultimately, having rejected Plaintiffs' arguments to the contrary, the Court concludes that Plaintiffs did not timely supplement their discovery responses relating to lost profit damages from lost sales.

As mentioned above, a key part of Plaintiffs' argument here is that Defendant should have realized, during the discovery period, that Plaintiffs were (or at least soon would be) abandoning their two-player/product theory—and that Plaintiffs would instead be asserting that the appropriate market includes more than just DuraSeal and Defendant's products. (D.I. 358 at 3-4; *see also* Tr. at 32-35) In fact, Plaintiffs go so far as to assert that "to say that [D]efendant did not know about a potential opinion [from Plaintiffs] that the appropriate market includes more than just DuraSeal and Adherus or that an appropriate market share allocation may be less

---

17.

than 100% is disingenuous at best." (D.I. 358 at 4) In support of this strong statement, Plaintiffs point to a significant amount of discovery that was provided and obtained during the discovery period (dating from early 2016); Plaintiffs assert that this discovery made it clear that they would be taking the "more than two-player market" position in this case. (D.I. 358 at 4; *see also* Tr. at 32-33 (Plaintiffs' counsel stating that, in light of what was disclosed in discovery, Defendant was not "surprised at all that we were going after these types of losses [e.g., losses attributable to a market share apportionment theory]")) More specifically, Plaintiffs point to the following categories of information, (D.I. 358 at 3-4):

> (1) opinions of Defendant's own damages expert, Douglas Kidder, from early Spring 2016, in which Mr. Kidder stated that lost profits might be an appropriate damages methodology, that fibrin glue was a part of the relevant market, and that he would expect to follow a market-share apportionment theory "with particular attention to the switching behavior of surgeons and the reasons for any such switching[,]" (D.I. 359, ex. C at ¶ 70; *see also id.*, ex. D at 89-90, 107, 110-12);
>
> (2) evidence HyperBranch produced during discovery, such as a document entitled "Estimated DuraSeal U.S. Marketplace Share in 2015 Based on Adherus Distributor Questionnaire Responses," (*see* D.I. 358 at 3);
>
> (3) documents produced by Plaintiffs on December 23, 2016, (*see id.* & D.I. 359, ex. E); and
>
> (4) June 6, 2017 deposition testimony of Plaintiffs' Rule 30(b)(6) witness, Curtis Lenox, in response to questions from Defendant's counsel, (D.I. 359, ex. F at 27-43, 55-57, 110-13, 138-42, 147-48, 200-05, 222-24, 227-29 & 233-38), in which Mr. Lenox testified, *inter alia*, that fibrin glue is often used instead of DuraSeal for dural sealing, and provided views on the relative market share captured by DuraSeal and fibrin glue products.

But this line of argument proves too much. That is because the logical extension of the

argument is that if Defendant had to know, as early as 2016, that Plaintiffs would be asserting that the market was broader than a two-party market, then *Plaintiffs had to know that too at the same time.* At a minimum, Plaintiffs surely would have been on notice that this was going to be their theory immediately following Mr. Lenox's deposition, in which, according to Plaintiffs, Mr. Lenox testified "all about" the relevant market and how it included fibrin glue options. (Tr. at 32) Yet Plaintiffs never supplemented their interrogatory responses. (D.I. 346, ex. E at 12-17) This constitutes a violation of Rule 26(e)(1). *See, e.g.*, *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012) ("Rule 26(e) requires that as theories mature and as the relevance of various items of evidence changes, responses to interrogatories, and particularly contention interrogatories, be corrected or supplemented to reflect those changes."); *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n Inc.*, 595 F.3d 1203, 1210-13 (11th Cir. 2010) (affirming the district court's exclusion of evidence relating to a new theory and category of damages, and finding that statements made during a deposition and references to expenses in a discovery supplement did not provide notice of the party's new theory of liability and damages claimed; instead the party "had a duty to supplement [its interrogatory responses] if it would introduce evidence on the" new liability and damages theories at trial) (cited in *Woods*, 692 F.3d at 1279).

The Court also takes a moment to address a seemingly inconsistent and irreconcilable argument that Plaintiffs made during oral argument on the Motion. During oral argument—and despite the above-referenced position taken in their briefing (that discovery produced during the case should have made it long clear to Defendant that Plaintiffs would be abandoning the two-party market theory)—Plaintiffs' counsel now was asserting that even *Plaintiffs* did not know that they would be relying on a market share apportionment theory until Plaintiffs' counsel

reviewed Mr. Jarosz's draft report (which was generated months after the close of the fact discovery period). (Tr. at 33 ("Your Honor, until [Mr. Jarosz] did his calculation, how could we even know that that was the way we were going to go forth?"); *id.* at 37-38) That assertion, obviously, is completely inconsistent with Plaintiffs' above-referenced position that *Defendant* should have *anticipated* many months earlier that Plaintiffs were (or were going to be) relying on this market share apportionment theory, based on the content of discovery. (*Id.* at 32-33)

The Court does not credit this late-provided, inconsistent argument. Federal Rule of Civil Procedure 26(g)(1) requires that when an attorney signs a discovery response, he or she "certifies that to the best of the person's knowledge, information and belief formed *after a reasonable inquiry*" that the response is not "unreasonable[.]" Fed. R. Civ. P. 26(g)(1) (emphasis added); *see also* Fed. R. Civ. P. 26(g)(1) advisory committee's note to 1983 amendment (explaining that Rule 26(g)(1) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of [the Federal Rules regarding discovery]. . . . The rule simply requires that the attorney *make a reasonable inquiry into the factual basis* of his response, request, or objection") (emphasis added); *Woods*, 692 F.3d at 1279 (noting that "Rule 26 imposes an obligation on parties to conduct a reasonable inquiry into the factual basis of their discovery responses"). It is the fault of Plaintiffs for not earlier identifying and disclosing that they would be relying on a market share apportionment theory—especially when, throughout the discovery period, Plaintiffs continued to double down on their repeated assertion to the contrary. In May 2017, for example, as the discovery period was closing, Plaintiffs prepared and sent responses to Defendant's damages interrogatories in which Plaintiffs again expressed their two-party market theory. And yet by Plaintiffs' own admission: (1) Plaintiffs did

not consult with their expert, Mr. Jarosz, before they submitted those interrogatory responses, (Tr. at 38-39), and (2) it should have been clear at that time to Plaintiffs that they were in fact going to be relying on a different theory.[10]

For all of the above reasons, the Court determines that Plaintiffs' market share apportionment theory, first articulated in the Jarosz Report, was untimely. The Court must next assess whether the relevant portions of the report should be stricken by applying the *Pennypack* factors.

### 2. Application of *Pennypack* Factors

The Court agrees with Defendant that the first *Pennypack* factor clearly weighs in its favor. Plaintiffs' failure to disclose the market share apportionment theory prior to service of the Jarosz Report understandably surprised Defendant, especially in light of Plaintiffs' prior repeated reliance on a completely different, contrary theory. (*See* D.I. 346 at 2) And this late disclosure could cause prejudice to Defendant. If the market share apportionment theory remained in the case, Defendant will be required to address it at a disruptive time, when the parties are otherwise preparing for the filing of case dispositive motions. Defendant has suggested that to sufficiently do so, it will need to undertake a significant amount of additional discovery including: (1) third-party depositions, in-depth interviews, and/or scientific surveys of hospitals and surgeons as to

---

[10] Additionally, once Plaintiffs' counsel reviewed the draft Jarosz Report (the final version of which was dated August 25, 2017), Plaintiffs should have then immediately supplemented their incorrect series of discovery responses. At least this would have allowed Defendant and the Court to recognize and assess this issue earlier. Instead, Plaintiffs did nothing, and simply served the Jarosz Report on September 8, 2017. This required Defendant to independently find and realize the shift in theories after the report was served, and then to respond appropriately. This, in turn, meant that the issue was not presented to the Court until late September/early October 2017.

the players that make up the relevant market and as to surgeon preference regarding a preferred dural sealant for various types of procedures; (2) testing the information that Mr. Jarosz relied upon for his market share apportionment theory; and (3) obtaining business reports from third-party market share firms. (*Id.*; Tr. at 21-23)

Plaintiffs' arguments to the contrary on the prejudice issue are not persuasive. Plaintiffs contend that Defendant should not be prejudiced because Mr. Jarosz relied on Defendant's own evidence in forming his opinion. (D.I. 358 at 4-5) But it is a substantively different thing for Defendant (on the one hand) to go about discovery by mainly trying to disprove Plaintiffs' position that the relevant market is a two-party market, as opposed to (on the other hand) being focused on using the discovery period to delineate exactly what the scope of a more-than-two-party/product market actually looks like. (*See* Tr. at 51) The former is a more "straightforward" issue to defend against, *State Indus., Inc.*, 883 F.2d at 1578, while the latter would require significantly different (and more expansive) discovery efforts. Plaintiffs also miss the point when they assert that Defendant has not been prejudiced because Defendant's damages expert was able to submit a rebuttal report, in which he opined on the appropriate market share allocation. (D.I. 358 at 5) In that rebuttal report, Defendant's expert expressly noted Plaintiffs' late disclosure and how it had resulted in an incomplete factual record regarding the relevant market. (D.I. 359, ex. H at ¶¶ 65-66) That Defendant's expert was able to provide some response does not "replace the months of analysis and discovery that HyperBranch would have conducted had it known Plaintiffs' true damages theories." (D.I. 365 at 2)[11]

---

[11] For example, while Defendant's expert, Mr. Kidder, cites to some third-party data that helps to articulate the scope of a more-than-two-party/product market, (*see, e.g.*, D.I. 359, ex. H at ¶ 27), he repeatedly explains how more data is needed to determine whether the relevant

As to the second and third *Pennypack* factors, while Defendant could cure the prejudice it faces by undertaking the discovery referenced above, the Court is doubtful that this cure could be accomplished in sufficient time so as to avoid disruption of the pre-trial process and the trial. Trial is set to begin in five months, with case-dispositive and *Daubert* motions due in one week. Defendant estimates that it will need "significant additional fact discovery" that would take months to obtain, in order to be in a position to sufficiently rebut Plaintiffs' market share apportionment theory. (D.I. 346 at 3; *see also* D.I. 365 at 2) In the Court's view this does not seem to be an unreasonable estimate, since at least the bulk of the discovery needed will be third-party discovery.[12] (*See, e.g.*, D.I. 359, ex. H at ¶ 64 (Defendant's expert asserting that "third party data" is needed for reliable market share figures)) But the current schedule to trial would not allow for that kind of disruption. These factors then favor Defendant's position.

With respect to the fourth *Pennypack* factor—whether Plaintiffs acted willfully or in bad faith by failing to supplement their response to the damages Interrogatory request—courts have tended to reserve such a finding for clear, egregious examples of misconduct. *See Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *11

market should be defined more broadly and/or what the contours of that market are, (*id.* at ¶¶ 57, 64, 65, 69).

[12] This is in contrast to other cases from this Court in which motions to strike have been denied and the opposing party permitted to proceed with late-disclosed theories. *See, e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA Inc.*, Civil Action No. 14-878-LPS-CJB, D.I. 243 at 20 (D. Del. Jan. 20, 2017) (denying motion to strike late-disclosed damages theory where the theory did not appear to be "especially complex," and where "even by Defendant's estimate any supplemental discovery" would be "focused" and "could be completed in a short timeframe"); *cf. Insight Equity v. Transitions Optical, Inc.*, No. 10-cv-635 (RGA), 2016 WL 7031281, at *2 (D. Del. Nov. 30, 2016) (denying motion to strike plaintiff's damages theory and allowing plaintiffs to submit an alternative damages model and report, where trial was scheduled for seven months away and plaintiffs were required to base their new theory on "facts currently in the record").

(D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 1006 (D. Del. 2013) (citing cases). Under this *Pennypack* factor, courts may also consider the non-movant's justifications for failing to timely disclose the relevant information. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012).

Here, as explained above, Plaintiffs should have earlier served a supplemental interrogatory response articulating the facts underlying their market share apportionment theory. The Court is not satisfied with Plaintiffs' wanting (and at times inconsistent) explanations for their failure to do so. At best, Plaintiffs' approach here amounted to disregard for their discovery obligations, and was not a responsible approach to take. But on the other hand, there is no direct evidence of bad faith or a willful intent to sandbag Defendant (as opposed to mere negligence). And so the record falls a bit short of the type of heightened or "egregious" showing of bad faith required by the caselaw in this Circuit. Thus, this factor does not favor exclusion of the evidence (though it does not exactly provide strong support for Plaintiffs' position, either).

As to the final *Pennypack* factor, Plaintiffs' market share apportionment theory is surely important to their case. Plaintiffs seek, pursuant to the theory, between [REDACTED] from lost sales through April 2018, which constitutes a significant amount of their overall damages estimate. (D.I. 346, ex. A at ¶ 318; *see also* D.I. 358 at 5) The Court notes, however, that the lost profits damages allegedly at issue here are not as large as they are in many other competitor patent infringement cases. This is likely because Plaintiffs currently appear to have a much larger share of the relevant market (as compared to Defendant). (*See, e.g.*, D.I. 346, ex. A at ¶¶ 94-95 (noting that between July 2015 and April 2017, Defendant sold [REDACTED] [REDACTED] of the accused products in the United States and generated revenues of [REDACTED], while Plaintiffs

sold [redacted] [redacted] in the United States and generated revenues of [redacted])) Additionally, exclusion of evidence relating to this theory would not foreclose Plaintiffs' damages case entirely. Plaintiffs would be able to assert a right to lost profits damages from price erosion and reasonable royalty damages, (D.I. 346, ex. A at ¶¶ 319-20), and could further seek injunctive relief if they prevail, (*see id.*, ex. B at 14-15 (Plaintiffs noting that "monetary damages [] only encompass a small portion of the total harm" in the case)). Moreover, the Court would permit Plaintiffs to submit a supplemental damages expert report in which they could pursue the lost profits theory that they disclosed throughout the case—one based on a two-player market—if Plaintiffs wished to do so and thought they could do so credibly. This factor, then, favors Plaintiffs but not to an overwhelming degree.

A majority of the *Pennypack* factors militate in favor of granting the sanction called for by Defendant's Motion. And indeed, the Court believes that such a sanction is warranted here. Again, this is a case where:

> (1) Plaintiffs consistently promoted a particular theory of damages throughout the case.
>
> (2) Plaintiffs repeatedly reaffirmed their reliance on that theory in the face of continued efforts by Defendant to ascertain whether Plaintiffs' position had changed.
>
> (3) Plaintiffs reaffirmed that reliance again at the end of the discovery period without consulting their own damages expert.
>
> (4) Plaintiffs did not disclose a new, contrary theory until the time when their damages expert's report was submitted.
>
> (5) Plaintiffs, by their own admission, should have known that they would be asserting this new theory many months (perhaps over a year) before they disclosed it.

(6) At oral argument, Plaintiffs introduced a new explanation for why they had not earlier disclosed this theory, which seems to contradict their prior arguments.

(7) The new disclosure would require significant new discovery, significant re-adjustment to the pre-trial schedule, and would likely threaten the trial date.

In light of all of this, the Court will GRANT the motion as it relates to Plaintiffs' lost profits theory based on market share apportionment. *See, e.g., Greatbatch Ltd. v. AVX Corp.*, Civil Action No. 13-723-LPS, D.I. 381 (D. Del. Aug. 17, 2015) (granting motion to strike late-filed infringement contentions where those contentions reflected a "new infringement theory [that is] inconsistent with its previous theory" and "prejudice [] could not be cured without dramatic change to the case schedule, which includes summary judgment motions being filed a week from now"); *Silver State Intellectual Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1166-67 (D. Nev. 2014) (granting motion to strike amendments adding two references as prior art for two of the asserted patents where "[a]lthough [the plaintiff/patentee] knew about these prior art references, [the plaintiff] did not know until the last day of discovery that [defendant] was contending both prior art references applied to both patents" and the plaintiff would "therefore [] be prejudiced by the late amendment"); *World Wide Stationary Mfg. Co., Ltd. v. U.S. Ring Binder, L.P.*, No. 4:07-CV-1947 (CEJ), 2009 WL 1605866, at *2 (E.D. Mo. June 8, 2009) (granting motion barring plaintiff from relying on a particular product model (EZ Comfort) on which to base its claim of lost profits, where during fact discovery, the patentee asserted it was relying on a different product model for its lost profits claim and where the patentee did not produce lost profit information regarding EZ Comfort until eight days after fact discovery had closed, despite having such information during the discovery period).

## IV. CONCLUSION

For the reasons set forth above, the Court hereby ORDERS that the Motion is GRANTED-IN-PART and DENIED-IN-PART. The portions of the Jarosz Report relating to Plaintiffs' lost profits theory based on price erosion will not be stricken. The portions of the Jarosz Report relating to Plaintiffs' lost profits theory based on market share apportionment will be stricken.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **November 17, 2017** for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: November 14, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE