IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTEGRA LIFESCIENCES CORP.,            )
INTEGRA LIFESCIENCES SALES LLC,        )
CONFLUENT SURGICAL, INC., and          )
INCEPT LLC,                            )
                                       )
                Plaintiffs,            )
                                       )
        v.                             )       Civil Action No. 15-819-LPS-CJB
                                       )
HYPERBRANCH MEDICAL                    )
TECHNOLOGY, INC.,                      )
                                       )
                Defendant.             )

## REPORT AND RECOMMENDATION

In this action filed by Plaintiffs Integra LifeSciences Corp., Integra LifeSciences Sales

LLC, Confluent Surgical, Inc. and Incept LLC (collectively, "Plaintiffs" or "Integra") against

Defendant HyperBranch Medical Technology, Inc. ("Defendant" or "HyperBranch"), Plaintiffs

allege infringement of United States Patent Nos. 7,009,034 (the "'034 patent"), 7,332,566 (the

"'566 patent"), 7,592,418 (the "'418 patent"), 8,003,705 (the "'3705 patent") and 8,535,705 (the

"'5705 patent") (collectively, the "patents-in-suit" or "asserted patents").[1]  Presently before the

Court are:  (1) HyperBranch's motion for summary judgment of non-infringement of claim 20 of

the '034 patent, claim 4 of the '566 patent, and claims 8 and 23 of the '418 patent (the

"Predetermined Thickness" claims), (D.I. 393) ("HyperBranch's Motion");[2] and (2) Plaintiffs'

---

[1]     Plaintiffs originally also alleged infringement of United States Patent No.
6,566,406, but Plaintiffs do not appear to currently be asserting any claims from that patent.
(*See, e.g.*, D.I. 402 at ix)

[2]     The Court notes that HyperBranch's Motion is included in HyperBranch's
"Motion for Summary Judgment of Non-Infringement and Invalidity of the Patents-in-Suit" in
which it, *inter alia*, moves for summary judgment with respect to other issues in addition to this
infringement issue.  (D.I. 393, 402)  This Report and Recommendation solely addresses the

motion for summary judgment of infringement of the Predetermined Thickness claims, (D.I. 399) ("Plaintiffs' Motion").[3]  The Court recommends that HyperBranch's Motion be DENIED and Plaintiffs' Motion be DENIED, for the reasons set out herein.

## I.    BACKGROUND

### A.    The Parties and the Accused Products

The Court incorporates by reference its recent discussion of the parties and of the accused products at issue here (HyperBranch's Adherus Dural Sealant, Adherus Spinal Sealant, Adherus AutoSpray Dural Sealant, and Adherus AutoSpray Extended Tip (ET) Dural Sealant (the "Accused Products")), which was set out in the Court's Report and Recommendation dated February 20, 2018.  (D.I. 508 at 2-3)  The Court also notes the following additional pertinent facts with respect to the Accused Products.

HyperBranch manufactures the Accused Products in North Carolina.  (D.I. 429, ex. 82 at ¶ 6)  HyperBranch then sells the Adherus AutoSpray Dural Sealant and Adherus AutoSpray Extended Tip (ET) Dural Sealant products to distributors in the United States, who in turn sell the products directly to end customers (i.e., hospitals and physicians).  (*Id.* at ¶ 24; *see also id.*, ex. 2 at 9; *id.*, ex. 3 at 142; *id.*, ex. 6 at Responses 23, 25)  With respect to the remaining Accused

---

parties' arguments relating to infringement of the Predetermined Thickness claims.

[3]      Plaintiffs' Motion further argues: (1) that the Court should grant summary judgment of infringement of claim 10 of the '034 patent; and (2) that the Court should grant it summary judgment on HyperBranch's defenses of laches, on HyperBranch's defense that the asserted claims of the '3705 patent are invalid for obviousness-type double patenting, and on HyperBranch's defense that asserted claims are invalid pursuant to 35 U.S.C. § 101.  (D.I. 400 at 4-14, 35-37)  With respect to claim 10, it is not a Predetermined Thickness claim, (*see, e.g.*, D.I. 441 at iv), and the Court will address it in a forthcoming opinion.  With respect to HyperBranch's defenses, HyperBranch does not contest this portion of Plaintiffs' Motion, (Tr. at 73), and therefore, the Court recommends that this portion of Plaintiffs' Motion be GRANTED.

Products, HyperBranch sells or sold them (as well at least Adherus AutoSpray Dural Sealant) to distributors abroad, who then sell the products to end customers. (*Id.*, ex. 82 at ¶¶ 11-12; *id.*, ex. 3 at 142; *id.*, ex. 6 at Responses 26-28; D.I. 456, ex. 13 at ¶ 48)

The Accused Products provide the materials, solutions and an applicator that a physician can use to make hydrogels. (D.I. 429, ex. 42 at ¶ 48) The Accused Products contain the same chemical formulation, although the Adherus Dural Sealant and the Adherus Spinal Sealant differ in the amounts of the components. (*Id.*, ex. 2 at 11-12, 23, 34-35) The Accused Products come with different applicator devices. (*Id.*, ex. 42 at ¶¶ 45, 148) The applicators for the Adherus AutoSpray Dural Sealant and Adherus AutoSpray Extended Tip (ET) Dural Sealant include a powered air-assist feature with a micro-pump that actively sprays the materials (the "AutoSpray device"), while the Adherus Dural Sealant and Adherus Spinal Sealant are deposited manually by applying pressure to plungers on the applicator ("manual applicator"). (*Id.* at ¶¶ 45-46) It is not in dispute that the use of the AutoSpray device's powered air-assist feature creates air bubbles in the hydrogels that are deposited by such a device. (D.I. 403, ex. A at ¶ 402; D.I. 429, ex. 76 at ¶ 91)

Each package of the Accused Products contains Instructions for Use ("IFU"). (D.I. 429, ex. 3 at 152) HyperBranch also trains its distributors to instruct physicians and their staff on how to assemble and use the Accused Products. (*Id.*, ex. 2 at 13; *id.*, ex. 4 at 30, 38) Upon request from a distributor, personnel from HyperBranch will join the distributor in demonstrating the use of the products in operating rooms. (*Id.*, ex. 2 at 15-16; *id.*, ex. 4 at 33-34, 37, 41) The Accused Products have been used in the United States and abroad to make hydrogels for dural repair. (*Id.*, ex. 6 at Responses 23, 25, 26, 27, 28)

3

**B.     The '418, '566 and '034 Patents**

The asserted patents all come from the same patent family.  They are directed to biocompatible crosslinked polymers (i.e., hydrogels) having certain features and methods for their preparation and use.  (D.I. 246, exs. A-F)[4]

The '418, '566 and '034 patents contain the Predetermined Thickness claims that are at issue in this Report and Recommendation.  The '418 patent is a continuation of the '566 patent, which is a continuation of the '034 patent.  (*See* Plaintiffs' Claim Construction Presentation, Slide 2)  It is entitled "Biocompatible Crosslinked Polymers with Visualization Agents" and it issued with 30 claims.  ('418 patent)  The '566 patent has the same title and issued with 38 claims.  ('566 patent)  The '034 patent is entitled "Biocompatible Crosslinked Polymers" and issued with 22 claims.  ('034 patent)  These three patents are directed to the following technological area:

> Biocompatible crosslinked polymers, and methods for their preparation and use, are disclosed in which the biocompatible crosslinked polymers are formed from water soluble precursors having electrophilic and nucleophilic functional groups capable of reacting and crosslinking in situ.  Methods for making the resulting biocompatible crosslinked polymers biodegradable or not are provided, as are methods for controlling the rate of degradation.  The crosslinking reactions may be carried out in situ on organs or tissues or outside the body.  Applications for such biocompatible crosslinked polymers and their precursors include controlled delivery of drugs, prevention of post-operative adhesions, coating of medical devices such as vascular grafts, wound dressings and surgical sealants.  Visualization agents may be included with the crosslinked polymers.

---

[4]     The asserted patents appear on the docket in this action more than once.  Citations to the patents will simply be to the '406 patent, the '034 patent, the '566 patent, the '418 patent, the '3705 patent and the '5705 patent.

(*See, e.g.*, '034 patent, Abstract)

### C.    Procedural History

Plaintiffs filed the instant case on September 15, 2015.  (D.I. 1)  On September 25, 2015,

Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial

matters, up to and including the resolution of case-dispositive motions.  (D.I. 15)

Briefing on the instant Motions was completed on December 21, 2017, (D.I. 463, 465),

and the Court heard oral argument on the Motions (and various other summary judgment and

*Daubert* motions filed in the case) on January 5, 2018, (D.I. 482 (hereinafter, "Tr.")).  A 7-day

trial is set to begin on April 16, 2018.  (D.I. 173)

## II.    STANDARD OF REVIEW

The Court incorporates by reference its prior discussion of the legal standards for

resolving summary judgment motions and for establishing patent infringement, which was also

found in its February 20, 2018 Report and Recommendation.  (D.I. 508 at 4-7)

## III.    DISCUSSION

The parties have filed cross-motions for summary judgment regarding HyperBranch's

alleged direct infringement under 35 U.S.C. § 271(a) of the Predetermined Thickness claims.

(D.I. 393, 399)  Plaintiffs also move for summary judgment that HyperBranch has infringed

certain of these claims under 35 U.S.C. §§ 271(b), 271(c), and 271(f).  (D.I. 400 at 1)  The Court

will address direct infringement first, and will then turn to Plaintiffs' other claims.

### A.    Direct Infringement

A party directly infringes a patent if it "makes, uses, offers to sell, or sells" the patented

invention without permission.  35 U.S.C. § 271(a).  Plaintiffs allege that HyperBranch is liable

for direct infringement of claim 20 of the '034 patent and claims 8 and 23 of the '418 patent, all

method claims, by developing and manufacturing the Accused Products. (*See* D.I. 400 at 1)

Plaintiffs allege that HyperBranch has directly infringed claim 4 of the '566 patent, which claims

a "polymeric coating for a substrate," ('566 patent, col. 39:2, 26-27), by making hydrogels used in

the Accused Products, (D.I. 400 at 1).

    The Court construed multiple terms found in each of these claims, including:

| Claim Term | Court's Construction |
|---|---|
| "visualization agent" | "a substance or material that is detectable by the human eye and that imparts a color or obscures the optical clarity of the hydrogel" |
| "observable change" | "change in the color or transparency of the hydrogel observable to the human eye" |
| "predetermined thickness" | "a thickness (which can be a singular thickness or a range of thickness), determined before application of the hydrogel, for a particular application" |

(D.I. 307 at 55; D.I. 379 at 2-6)  In accordance with the Court's constructions, the Predetermined

Thickness claims require a "visualization agent" that causes a visually "observable change" that

is correlated with a thickness of hydrogel, such that the "observable change" can be used to

indicate that a "predetermined thickness" of the hydrogel has been deposited (i.e., the

"predetermined thickness requirement"). (*See* D.I. 400 at 15; D.I. 441 at 16)  The Court's claim

construction orders explained that "air or air bubbles alone" could not constitute a visualization

agent. (D.I. 307 at 13; D.I. 379 at 5)  Plaintiffs allege that HyperBranch directly infringes the

Predetermined Thickness claims either literally or under the doctrine of equivalents. (*See, e.g.*,

D.I. 443 at 24)

    **1.    Literal Infringement**

6

### a.    Claim 20 of the '034 Patent

Claim 20 of the '034 patent, which depends from claim 16, recites:

> **16.** A method for formulating a polymer composition that crosslinks to form a hydrogel, the method comprising *selecting a concentration of visualization agent for the polymer composition such that the visualization agent causes a visually observable change that indicates that a crosslinked hydrogel having a predetermined thickness has been formed* on the tissue of a patient wherein the polymer composition comprises electrophilic functional groups and nucleophilic functional groups that crosslink to each other.
>
> **20.** The method of claim **16**, wherein the polymer composition crosslinks to form a hydrogel within about 60 seconds after being applied to a substrate.

('034 patent, col. 40:41-49, 58-60 (emphasis added))[5]  Plaintiffs note that there is one relevant affirmative step in this method claim:  *selecting* a concentration of visualization agent for the polymer composition, such that the visualization agent will cause an "observable change" that is correlated with a thickness of hydrogel, and can therefore be used to indicate that a predetermined thickness of the hydrogel has been deposited.  (Tr. at 28)

Here, it does not appear to be disputed that HyperBranch selects for the Accused Products, in advance, an amount of blue and yellow dye that ultimately forms a green dye, in the amount of approximately 120 ppm.  (D.I. 429, ex. 73 at HBMT0447921; *id.*, ex. 39 at 18-19)[6]  It

---

[5]     The Court also previously construed a portion of the claim's predetermined thickness requirement—i.e., "the visualization agent causes a visually observable change that indicates that a crosslinked hydrogel having a predetermined thickness has been formed"—to mean "the visualization agent causes a visually observable change that is correlated with a thickness of hydrogel, such that the change can be used to indicate that a crosslinked hydrogel having a predetermined thickness has been formed."  (D.I. 307 at 56)

[6]     This is the same amount of dye contained in Plaintiffs' patented DuraSeal product.  (D.I. 429, ex. 73 at HBMT0447921; Tr. at 16)  DuraSeal contains a blue dye.  (D.I. 429,

also does not appear to be disputed that HyperBranch teaches users of its products to apply the

hydrogels in the Accused Products at a thickness of between 1-2 mm. (D.I. 400 at 16) Indeed,

HyperBranch's IFUs for the Accused Products instruct the user to "[c]ontinue applying the

[Adherus sealant system] until a thin coating (approximately 1-2 mm) is formed." (D.I. 429, ex.

8 at 10; *id.*, ex. 9 at 6; *id.*, ex. 10 at 4; *id.*, ex. 11 at 12; *id.*, ex. 12 at 10) Thus, it is Plaintiffs'

position that a coating of 1-2 mm is the relevant "predetermined thickness" for purposes of their

infringement arguments—that is, a "'thickness (which can be a singular thickness or a range of

thickness), determined before application of the hydrogel, for a particular application.'" (*See* D.I.

400 at 16)[7]

  The crux of the infringement dispute between the parties with respect to claim 20 is

whether HyperBranch selects a concentration of colorant dye in the Accused Products such that

this "visualization agent" causes a visually "observable change" that is correlated with the

predetermined thickness of 1-2 mm. (Tr. at 19 (Plaintiffs' counsel explaining that "[t]he only

disputed issue[] with respect to the [P]redetermined [T]hickness claims is whether or not the

observable change is caused by the colored dye" in the Accused Products); Plaintiffs' Motion for

Partial Summary Judgement Presentation, Slide 21; D.I. 441 at 15-16 ("HyperBranch . . . is

entitled to summary judgment of non-infringement in light of the Court's claim constructions and

the absence of evidence that any 'visualization agent' in the accused hydrogels causes an

---

ex. 73 at HBMT0447921) DuraSeal is marked with the '566 patent, which is a representation
that the product is covered by at least one claim of that patent. (*See id.*, ex. 90 at ¶ 306)

  [7]  The IFUs for the patented DuraSeal products instruct users to deposit this same
predetermined thickness (1-2 mm). (D.I. 429, ex. 92 at INT00836624 ("Continue applying the
hydrogel until a thin (1-2) mm coating is formed."); *id.*, ex. 93 at INT00836623 (same))

'observable change' that is correlated with a predetermined thickness of the hydrogel")

(emphasis omitted))  For the reasons discussed below, the Court finds that a reasonable jury,

drawing all inferences in the light most favorable to Integra, could (but need not) find that

HyperBranch directly infringes claim 20 of the '034 patent by formulating and manufacturing the

Accused Products.

The Court will first discuss the evidence that Plaintiffs rely upon in establishing their

infringement position, and explain why it at least establishes a genuine dispute of fact as to

whether HyperBranch infringes claim 20.  Then, the Court will assess HyperBranch's arguments

and evidence and explain why, in the Court's view, it could also lead a factfinder to find non-

infringement of claim 20.

### (1)    Plaintiffs' Evidence

For their part, Plaintiffs assert that the amount of green dye selected by HyperBranch for

the Accused Products "causes an observable change [in color and transparency of the hydrogel]

that is correlated with a thickness of hydrogel, such that the change can be used to indicate that a

predetermined thickness of the hydrogel [of 1-2 mm] has been deposited on the substrate."  (D.I.

400 at 16; *see also* D.I. 465 at 11)  As an initial matter, Plaintiffs assert that it is "notable" that

HyperBranch decided to use the exact same concentration of dye in its Accused Products as is

used in the patented DuraSeal products.[8]  (Tr. at 16; *see also* D.I. 465 at 11; D.I. 400 at 16 n.11)

The patents themselves discuss the significance of the selection of the concentration of

visualization agent, (Tr. at 16-17; *see also* D.I. 429, ex. 76 at ¶ 53):

---

[8]      The IFUs for DuraSeal state that "[t]he blue color of the hydrogel aids in gauging
thickness.  As the thickness of the hydrogel increases to 2 mm, the fine epidural vasculature
becomes less visible."  (D.I. 429, ex. 92 at INT00836624; *id.*, ex. 93 at INT00836623)

> One embodiment is to introduce a concentration of visualization agent into the hydrogel so that the user applies the hydrogel until the microvasculature is no longer visible through the hydrogel, at which point the hydrogel is a desired thickness. Another suitable method is to apply the hydrogel until the underlying tissue is obscured. An appropriately selected concentration of visualization agent is used so that the hydrogel obscures the tissue features when the hydrogel achieves a predetermined thickness.

('034 patent, col. 7:28-36). In arguing that there are no genuine disputes of material fact here (and that HyperBranch thus directly infringes claim 20 of the '034 patent), Plaintiffs rely on a few different categories of evidence.

First, Plaintiffs point to certain of HyperBranch's own documents. (D.I. 400 at 16-17; D.I. 443 at 19-20; D.I. 465 at 11-12) For instance, several HyperBranch NuSeal 100[9] product training presentations explain that "[w]hen applied . . . [the] [g]reen colorant allows for visualization of gel coverage *and thickness*." (D.I. 429, ex. 62 at HBMT0490731 (slide 40) (emphasis added); *see also id.*, ex. 63 at HBMT0448156 (slide 12); *id.*, ex. 64 at HBMT0190029; *id.*, ex. 3 at 213-14) Relatedly, a HyperBranch document recording Meeting Minutes for a conference call with the United States Food and Drug Administration ("FDA") indicates that an FDA participant stated "that removing the color [of the NuSeal 100 product] could be a problem, because *it provides a visual cue to the user regarding* coverage and *thickness*." (*Id.*, ex. 65 at HBMT0448539 (emphasis added); *see also id.*, ex. 3 at 230)

Additionally, HyperBranch's IFUs for the Accused Products instruct users that to "[g]aug[e] [t]hickness[,]" the user should "[e]nsure that all suture knots are completely covered

---

[9]    NuSeal 100 Surgical Sealant "is the same as" the delivered hydrogel from the Accused Products, (D.I. 429, ex. 67; *see also id.*, ex. 3 at 121-23), and as such, the products have the same concentration of green dye, (*id.*, ex. 3 at 200, 207-08).

10

with hydrogel sealant. . . . [c]omplete knot coverage ensures that the minimum thickness of application [1-2 mm] is achieved." (*Id.*, ex. 8 at 11; *id.*, ex. 9 at 7; *id.*, ex. 10 at 5; *id.*, ex. 11 at 12; *id.*, ex. 12 at 10; *see also id.*, ex. 3 at 64 (HyperBranch's 30(b)(6) witness explaining that "we want to be able to see where the gel is placed and then you want to be able to estimate thickness, and we do that by . . . covering the suture knots")) Plaintiffs' expert, Dr. Jimmy Mays, summarizes Plaintiffs' view of how these instructions (and the remainder of the evidence Plaintiffs rely on) support the assertion that HyperBranch infringed the Predetermined Thickness claims:

> When the suture knots are "completely covered," the hydrogel coating has a uniform green color and, as explained below, the green color contributes to an observable change—e.g., the underlying dural tissue goes from looking red/pink in appearance to looking green, and the underlying sutures and the patterns formed by the stitching of the sutures are obscured. The underlying features of the dural tissue are obscured as a result of the change in transparency of the hydrogel caused in part by the dye in the hydrogel. Thus, HyperBranch has determined the predetermined thickness of 1-2 mm and is teaching users how to achieve the predetermined thickness. The uniform green color of the hydrogel indicates a predetermined thickness of hydrogel has been deposited on the tissue, and the green color obscures visible features of the underlying tissue and sutures. HyperBranch's own instructions provide a direct correlation between the visually observable change (obscuring the sutures) and the predetermined thickness of the hydrogel.

(D.I. 429, ex. 76 at ¶ 58; *see also id.* at ¶ 67 (explaining that "[t]he dye in the accused Adherus hydrogels obscures the sutures, i.e., makes the sutures dim and less visible, upon application of the hydrogel at the predetermined thickness. This is an observable change"))

Second, Plaintiffs point to four of HyperBranch's own videos (and still images from those videos)—two of which show application of the Accused Products in a surgical setting, and two

11

of which appear to show test applications of the Accused Products. (D.I. 429, exs. 17-20, 48) Three of the videos show applications of the Adherus AutoSpray Dural Sealant, (*id.* at exs. 17-19), and one of the videos shows application of the Adherus Spinal Sealant (which does not utilize an AutoSpray device), (*id.* at ex. 20). Plaintiffs assert that these videos show that the green dye in the Accused Products causes a change in the color and transparency of the hydrogel when the products are applied until the hydrogel completely covers the sutures; they assert that this process (as taught in HyperBranch's IFUs) tells the viewer that the hydrogel has been deposited at a thickness of 1-2 mm. (D.I. 400 at 17; D.I. 465 at 12; Tr. at 18-19) According to Plaintiffs, as the application of the hydrogel progresses in the videos, the transparency of the hydrogel decreases while the green color of the hydrogel becomes more intense, and this change indicates when the sutures are covered. (Tr. at 14-15; Plaintiffs' Motion for Partial Summary Judgment Presentation, Slide 28) And, having viewed the videos, the Court agrees that this is a reasonable conclusion one could draw.

Third, Plaintiffs cite in support to the testimony of neurosurgeons who have used the Accused Products. (D.I. 400 at 17; D.I. 443 at 22-23; D.I. 465 at 11) To summarize portions of this testimony:

      (1)    Kost Elisevich, M.D. testified that when the hydrogel is first applied, it is deposited in a "drop-like" fashion over the surface, and he can determine that he has reached 1-2 mm when there is a "contiguous surface" over the entire area, and the green color of the hydrogel assists in this determination "[i]n that it provides [him] some assurance that there's contiguity on the surface[.]" (D.I. 429, ex. 25 at 20-21; *see also id.* at 26-27, 30, 33, 56-57)

      (2)    Hoi Sang U, M.D. testified that he can tell that he has deposited 1-2 mm of the hydrogel when "[t]he product

12

becomes opaque" and the underlying features of the surgical site are covered up. (*Id.*, ex. 74 at 31-33; *see also id.* at 45-46) The increasing "intensity" of the green color helps Dr. U determine when he has applied an appropriate layer of thickness of the product. (*Id.* at 56-57, 64-65)

(3)     Jay Howington, M.D. testified that he uses a change in the transparency of the hydrogel to judge its thickness when applying it to a patient: "once I have enough of a coating, enough of a layer down, it becomes opaque and I can't see what's underneath it. That's told me I've got enough on there. . . . [I]f you get enough to where you begin to see where it's all green, then it's on. . . . [O]nce it's green, then I know that I've got everything covered. . . . [T]he adequacy of coverage happens when that opacity fully occurs where you can't see the suture through the material." (*Id.*, ex. 21 at 22-24, 45)

(4)     Emad Shenouda[10] explained that he "always appl[ies a] thin layer, enough to seal the holes in the dura and secure the suture line. So once I get the homogeneously green color, I stop." (*Id.*, ex. 28 at 18-19)

(5)     Paul Grundy testified that he knows that he has applied the hydrogel at a sufficient layer of thickness by a visual inspection showing that the hydrogel has formed a layer across the cavity, and the green dye of the product makes this possible. (*Id.*, ex. 27 at 15-17)

Fourth, Plaintiffs rely on the testing performed by their expert, Dr. Jimmy Mays. (D.I. 400 at 17; D.I. 443 at 20-21; D.I. 465 at 12-13) Dr. Mays applied the hydrogel of the Accused Products in four applications to a tissue substrate that had a suture placed on top. (D.I. 429, ex. 90 at ¶ 67) He performed four experiments in the following way. Dr. Mays first applied dyeless hydrogel to the substrate with a manual applicator. Next, Dr. Mays applied a dye-containing

---

[10]     Mr. Shenouda and the next physician, Paul Grundy, are neurosurgeons in the United Kingdom, where male physicians are addressed as "Mr." instead of "Dr." (D.I. 429, ex. 28 at 5; Tr. at 22-23)

hydrogel to the substrate using a manual applicator. Then Dr. Mays applied dyeless hydrogel to

the substrate using the AutoSpray device. Finally, Dr. Mays applied dye-containing hydrogel to

the substrate using the AutoSpray device. He utilized both types of applicators in his

experiments, in light of HyperBranch's contention (to be discussed in more detail below) that air

bubbles present in the hydrogels deposited by the AutoSpray device prevent the green dye from

serving as the claimed visualization agent. (*See id.* at ¶¶ 66, 68) He took photographs of the

experiments at each step (i.e., a photograph of the suture before any hydrogel had been applied,

as well photographs of the sutures after the first, second, third and fourth applications). (*Id.* at ¶

67) Dr. Mays opines that his experiments demonstrate that:

> Regardless of using the . . . AutoSpray device or the manual
> applicator, the dye in the [Accused Products] obscures features of
> the tissue substrate compared to the dye-less hydrogel and informs
> the user that more Adherus material needs to be applied to achieve
> a thicker hydrogel on the way to a predetermined thickness where
> an even continuous green color indicates that an appropriate
> amount (predetermined thickness) of Adherus material has been
> applied to the tissue.

(*Id.* at ¶ 68)

In light of the above evidence, the Court concludes that a reasonable jury, drawing all

reasonable inferences in favor of Plaintiffs, could find that HyperBranch's formulation and

manufacture of the Accused Products satisfy the predetermined thickness requirement.

HyperBranch selects a concentration of colorant dye for its Accused Products, and a jury could

find that such an amount of dye causes the hydrogel (after continued application) to turn an even

green color that obscures the underlying features of the substrate when a desired thickness range

of 1-2 mm has been reached. (*See, e.g., id.*, ex. 76 at ¶ 57; Tr. at 18, 20 (Plaintiffs' counsel

asserting that "HyperBranch chose the concentration of the green dye such that it starts to become less transparent, the green color becomes more intense as you start to approach that minimum thickness of one to two millimeters of hydrogel. . . . [I]n order for users to determine whether they're arriving at that one [to] two millimeters of thickness, HyperBranch has chosen that predetermined concentration that's going to give them that sweet spot."))[11]

HyperBranch's arguments to the contrary (that is, that Plaintiffs' evidence cannot demonstrate even the existence of a genuine issue of material fact) were not convincing.

For example, HyperBranch asserts that its IFUs and other documents do not teach infringement because they do not instruct the user to utilize an observable change in the transparency or the color of the hydrogel that is correlated with a thickness, in order to determine that a predetermined thickness has been reached. (D.I. 441 at 18)  Rather, HyperBranch contends, the IFUs teach to simply cover the suture knots, which conveys that, at best, "'a minim[al] thickness of [e.g., between 0.6 and 0.8 mm] is achieved.'" (*Id.* (quoting D.I. 401, ex. 8 at 11))

As for the latter point, it is misleading.  As described above, the IFUs instruct the user to apply the hydrogel of the Accused Products *until a coating of approximately 1-2 mm is formed.* The IFUs' reference to a thickness of "0.6 to 0.8 mm" describes the width of the knot of the *smallest sutures* typically used for dural closure.  (D.I. 401, ex. 8 at 11 ("Typically, size 4-0, size

---

[11]      As Plaintiffs point out, the method claim at issue requires the direct infringer to *select* a concentration of visualization agent that will cause an observable change correlated with a predetermined thickness; there is no requirement in the claim that, for Defendant's infringement to be complete, a user must actually apply the hydrogel to a patient's tissue and look for the observable change in doing so.  (D.I. 465 at 15; Tr. at 26-28; Plaintiffs' Motion for Partial Summary Judgment Presentation, Slide 39)

3-0 and size 2-0 sutures are used for dural closure. The smallest of these is size 4-0 which has a diameter of 0.15 mm to 0.2 mm. *A knot of size 4-0 suture will have* at least four widths of suture or *approximately 0.6 to 0.8 mm of thickness.* Complete knot *coverage* ensures that the minimum thickness of application is achieved") (emphasis added)) A reasonable inference is that covering sutures that are 0.6 to 0.8 mm thick—the smallest used—will result in a minimal thickness of approximately 1 mm. (*See* D.I. 465 at 20 n.7)

And as for the former point, while it is true that the IFUs do not explicitly instruct the user to utilize an observable change in the color or transparency of the hydrogel that is correlated with a thickness of 1-2 mm, that is not fatal to Plaintiffs' allegation of direct infringement of claim 20. To directly infringe the claim, HyperBranch need only *select* a concentration of visualization agent such that *it will cause* an observable change that indicates that a coating of 1-2 mm of hydrogel has been deposited. (*See* '034 patent, col. 40:41-49, 58-60; *see also supra* n. 11) The IFUs instruct neurosurgeons to ensure that all suture knots should be completely covered with hydrogel sealant to ensure that the "minimum thickness" of application is achieved, and they teach that the hydrogel should be applied until a coating of approximately 1-2 mm in thickness is deposited. (*See, e.g.*, D.I. 429, ex. 8 at 10-11) This can amount to evidence that HyperBranch infringes the claim by selecting the requisite kind of visualization agent.

Moreover, the IFUs need not and do not make up the whole of the evidence of infringement. As described above, Plaintiffs cite to other record evidence (e.g., Dr. Mays' opinion and testing, neurosurgeon testimony, HyperBranch's videos) that may indicate to a reasonable juror that when all suture knots are completely covered as taught by the IFUs, the green dye in the hydrogel "contributes to an observable change"—that is, that the underlying

16

sutures and the features of the dural tissues are obscured "as a result of the change in transparency of the hydrogel caused in part by the dye in the hydrogel." (D.I. 429, ex. 76 at ¶ 58; *see also, e.g.*, *id.*, ex. 74 at 31-33 (Dr. U testifying that he knows to stop applying the Accused Products because at approximately 2 mm the hydrogel "becomes opaque" and "covers up the underlying features of the surgical site"); D.I. 443 at 20 ("HyperBranch's videos demonstrate that the green dye, in fact, causes a change in color and transparency of the hydrogel when the hydrogel is applied 'until a thin coating (approximately 1-2 mm) is formed'—i.e, when 'suture knots are completely covered with hydrogel sealant.'"))

HyperBranch's next argument is that its videos cannot prove infringement because there is no indication of hydrogel thickness in any video, and Plaintiffs failed to measure the thickness. (D.I. 441 at 20-21)  But based on the teachings of the IFUs, and taking the evidence in the light most favorable to Plaintiffs, a reasonable inference is that hydrogels of 1-2 mm were deposited in these videos (since the hydrogels are applied to the extent that they cover the sutures). (D.I. 465 at 12)

HyperBranch next argues that the video evidence is defective for another reason—that the videos do not show that the color of the hydrogel is the same between the two applications at any particular thickness, which it says is a prerequisite to establishing a color-thickness correlation. (D.I. 441 at 21)  In support, HyperBranch points to a side-by-side comparison of still shots (one of the hydrogel applied to a patient, and the other of hydrogel applied to a test surface) from two HyperBranch videos depicting two different shades of green.  (*Id.*)

However, Dr. Mays retorts that the difference in color here is due to the differing conditions under which the videos were filmed—i.e., using different video cameras, different

17

lighting, at different angles—and not due to the color of the precursor and the applied hydrogels themselves.  (D.I. 465 at 13; D.I. 443 at 21 (citing D.I. 429, ex. 76 at ¶ 90))  In the Court's view, when drawing all reasonable inferences in favor of Plaintiffs, that seems an acceptable possibility.[12]

Moreover, HyperBranch's argument that Plaintiffs have not shown that "the color of the hydrogel [in HyperBranch's videos] is *the same* between [] applications at any thickness[,]" (D.I. 441 at 21 (emphasis added)), is off the mark in another respect.  It sounds like HyperBranch is suggesting that, pursuant to the Court's claim construction, the hydrogel has to turn a specific, single shade of green once it has been deposited to between 1-2 mm on any patient, under any circumstances.  But that reads too much into the construction.

Rather, as the Court previously explained, the correlation requirement can be satisfied based on the user's observations:

> [F]rom what the Court can tell, Plaintiffs do not seriously dispute that, if "predetermined thickness" is properly construed to encompass a range [of thickness], then a correlation is required. During the Preliminary Injunction oral argument, for example, Plaintiffs' counsel explained that "[w]hat we're saying is required is that you'll see an observable change which will correlate or correspond to a range, just like it says in the patent, the predetermined thickness can be a range." (D.I. 159 at 230 (emphasis added); *see also id.* at 58 (Plaintiffs' counsel explaining that the user will do a test application and will measure to see if he is in the range that he wants, and then will be able to see the observable change at that thickness and will then "know exactly what to look for when [the user goes] out to actually do it in [] a neurosurgical operation"))

---

[12]    The Court notes that Defendant's expert, Dr. Anthony Lowman, in describing why one disk of hydrogel used in his experiments appeared to be a lighter green color than another disk, similarly stated that, *inter alia*, "ambient lighting conditions" were likely a factor.  (D.I. 403, ex. A at ¶ 406)

(D.I. 307 at 48-49 (emphasis omitted))  Here, the IFUs teach that "[t]he neurosurgeon should have 'hands-on' experience with simulated use of the Adherus sealant in a bench top model prior to patient use.  The training should also review the device, its Instructions for Use, and precautions, as well as the details of the clinical study." (*See, e.g.,* D.I. 429, ex. 8 at 5)  Thus, the IFU encourages neurosurgeons to test the hydrogel and observe its characteristics as it is applied, so they will know what to look for when using it in a surgical setting.  The patents similarly teach that such prior experience with the claimed hydrogels is useful:

> The user may apply the hydrogel to a test surface with a color that resembles the surface that the user contemplates using and observe the color that results when the hydrogel reaches a desired thickness that the user has predetermined.  In use, the user applies the hydrogel until the desired color is reached.

('034 patent, col. 7:21-26)  It is a reasonable inference, then, that neurosurgeons would know what the hydrogel's color and transparency should look like when the hydrogel is applied to a patient and reaches the desired range of thickness (1-2 mm).  (D.I. 465 at 14)  But the Court did not say (and does not find) that the articulated result of the observable change has to be the *exact same color* in all applications on all patients.

For all of these reasons, the Court finds that Plaintiffs have presented sufficient evidence to at least raise a genuine issue of material fact as to whether HyperBranch infringes the predetermined thickness requirement of claim 20 of the '034 patent.

### (2)     HyperBranch's Evidence

Yet HyperBranch also puts forward evidence that could lead a reasonable juror to conclude that it does *not* infringe claim 20 of the '034 patent.  The Court will now highlight some of that evidence and why it supports the Court's conclusion.

### (a) Presence of air bubbles in the hydrogels prevent infringement

The hydrogels emitted using the powered air-assist feature of the AutoSpray device contain air bubbles, and HyperBranch asserts that it is these *air bubbles* that affect the visual appearance of the hydrogel—such that there is no correlation between the *dye* in the hydrogel and an observable change at a predetermined thickness. (D.I. 441 at 23, 26-27) In other words, HyperBranch is arguing that to the extent that the hydrogel becomes opaque at the predetermined thickness range of 1-2 mm, it is the air bubbles, not the dye, that is causing that. (*Id.* at 26-27; Tr. at 42-44, 46, 48) And HyperBranch therefore asserts that (1) because air bubbles cannot be a "visualization agent," and (2) air bubbles are what allow any correlation between the hydrogel and a predetermined thickness, then (3) no reasonable juror could determine that HyperBranch's formulation and manufacturing of the accused products infringes the predetermined thickness requirement of claim 20.

HyperBranch points in support to two experiments performed by its expert, Dr. Anthony Lowman. (D.I. 441 at 23) In the first experiment, Dr. Lowman used the accused AutoSpray device and prepared several disks of hydrogels that measured between 1.5 and 1.8 mm thick. He prepared these disks in four different ways: (1) with the powered air-assist function turned on; (2) with the powered air-assist function turned off; (3) with the powered air-assist function turned on and using no dye in the precursor; and (4) with the powered-air assist turned off and using no dye in the precursor. (D.I. 403, ex. A at ¶ 401) Then, Dr. Lowman took photographs of each of the disks placed over black text. (*Id.*) In the photographs, the hydrogels made with the air-assist function turned on (and thus containing air bubbles) completely obscure the black text beneath them, while the black text is discernible in those hydrogels formed without the air-assist feature.

20

(*Id.*) Dr. Lowman opined that the experiment demonstrates that the opacity of the hydrogels is due to the air bubbles—and that any contribution to opacity by the colorant dyes is *de minimus* at best. (*Id.* at ¶ 402)

In the second experiment, Dr. Lowman made several hydrogels using the accused AutoSpray device with the air-assist feature turned on where (1) multiple layers of the material were applied in several passes and (2) the entire coating was sprayed in a single application. (*Id.* at ¶ 403) He then extracted small disks of the hydrogels and measured their thickness as 3.0 mm and 1.4 mm, respectively, and photographed them side-by-side. (*Id.* at ¶¶ 404-05) Dr. Lowman observed from the photograph that "there is no observable change in the color of the hydrogels that is correlated with thickness." (*Id.* at ¶ 406) Indeed, he observed that the thicker hydrogel disk appeared to have a *lighter* green color than the thinner hydrogel disk; Dr. Lowman thought was likely due to a more "foam-like" environment in the thicker disk (and due to issues involving ambient lighting conditions). (*Id.*)

The Court finds that the presence of the air bubbles in the Accused Products that utilize the AutoSpray Device creates a genuine dispute of material fact as to whether Hyperbranch directly infringes the predetermined thickness claims (at least as to those two products). Indeed, the parties' experts strongly disagree on this question.

For instance, in response to Dr. Lowman's experiments and opinions described above, Dr. Mays takes a different tack, and asserts that the dye in the Accused Products does cause an observable change that is correlated with a predetermined thickness. In Dr. Mays' experiments, he concluded that the hydrogel changed from a faint green color to a *deeper* green color when the range of 1-2 mm was achieved. (D.I. 429, ex. 76 at ¶ 74) Dr. Mays cites to photographs from his

21

own experiments in opining that:

> Regardless of using the air-assist feature of the AutoSpray device or the manual applicator, the dye in the Adherus material obscures features of the tissue substrate compared to the dye-less hydrogel and informs the user that more Adherus material needs to be applied to achieve a thicker hydrogel on the way to a predetermined thickness where an even continuous green color indicates that an appropriate amount (predetermined thickness) of Adherus material has been applied to the tissue.

(*Id.* at ¶ 79)  Dr. Mays also opines that Dr. Lowman's black lettering/hydrogel disk experiment (described above) is not persuasive.  This is because, *inter alia*, in Dr. Mays' view, the experiment's results show that the dye in the hydrogel *does* make it more difficult to see the underlying features (as compared to the results involving the colorless hydrogel).  (*Id.* at ¶ 80)  And Dr. Mays describes how other of Dr. Lowman's testing and images show that the dye in the Accused Products causes the substrate below to be more opaque (as compared with the use of a dye-less hydrogel)—even when the AutoSpray device is used.  (*Id.* at ¶¶ 80-86; Plaintiffs' Motion for Partial Summary Judgment Presentation, Slides 36-37)  In the Court's view, a jury should decide who is correct.

### (b)  An even green color/uniform green color is not a sufficient observable change

Furthermore, HyperBranch asserts that Plaintiffs' experts' position (that the requisite correlation occurs when an "even green color" has been achieved) cannot prove a color-thickness correlation.  (D.I. 441 at 21)  To that end, HyperBranch argues that uniformity of a color has "no meaning[,]" that whether something is uniform in color is "subjective,"[13] and that there is little

---

[13]     The Court has already rejected Defendant's argument the claim term "observable change" is "purely subjective" and thus indefinite.  (D.I. 307 at 32-36 (internal quotation marks omitted))  That said—as to whether a factfinder would determine from the evidence of record

evidence supporting any correlation between a uniform green color and a predetermined thickness. (*Id.*) To that end, Dr. Lowman opined that the ability to achieve an even green color is due to the AutoSpray device applicator, and has nothing to do with a change in color at a predetermined thickness. (D.I. 403, ex. A at ¶¶ 445-46) A factfinder might agree with Dr. Lowman on this point, in light of the evidence he musters.

But the factfinder could be persuaded by Plaintiffs' contrary position. Dr. Mays opined that the dye in the Accused Products is responsible for indicating that a sufficient thickness of hydrogel has been deposited. He explained that the initial pass of hydrogel provides a "green tint with gaps which is not a continuous even green color." (D.I. 429, ex. 76 at ¶ 63) However, when an even green color has been achieved, that indicates that a continuous layer of the hydrogel has been applied (such that the underlying sutures are obscured). (*Id.*; *see also id.*, ex. 61 at 73-74) A reasonable jury could agree and find that the change from that initial pass to the desired end-point is a "change in the color . . . of the hydrogel observable to the human eye." Indeed, certain testimony of the neurosurgeons supported this notion. (*See, e.g., id.*, ex. 25 at 26-27, 30 (Dr. Elisevich testifying that the color of the hydrogel helps him determine that the underlying dura has been sufficiently covered because as it helps show whether any of the spray products are not linking with one another))[14]

---

that a visualization agent in the Accused Products does not, in fact, cause any visually "observable change" (of the kind required by this claim term)—that is a question of fact.

[14]    HyperBranch additionally argues that Plaintiffs fail to prove that HyperBranch performs all of the steps necessary for direct infringement of claim 20, because: (1) Plaintiffs fail to allege that HyperBranch itself (rather than an independent actor) has performed all of the steps of the method claim; and (2) Plaintiffs fail to establish that HyperBranch forms a hydrogel "on the tissue" of a patient. (D.I. 441 at 30) But Plaintiffs *do* allege that "HyperBranch, as the manufacturer of the Adherus products, has 'formulat[ed] a polymer composition[]' [and that it] is

          (c)      **Neurosurgeon testimony indicating that they do not rely on a change in color to indicate when a predetermined thickness is applied**

HyperBranch also points to neurosurgeon testimony that could be used to demonstrate that a visualization agent does not cause a change in color of the hydrogel correlated to indicate when a predetermined thickness has been achieved. (D.I. 441 at 23)  For example, at one point during his deposition, Dr. Elisevich testified that "the color of the gel is simply an indicator . . . of the contiguity of the surface that's applied so that you can be assured there are no defects in that surface." (D.I. 429, ex. 25 at 24)  When then asked if the color of the hydrogel aids him in determining the thickness of the hydrogel in a patient, he replied, "I don't think it really does." (*Id.*)  Dr. Howington explained that he does not have in mind a particular green color that he feels that he needs to achieve in order to reach a predetermined thickness. (*Id.*, ex. 21 at 21)  He further testified that during application, the intensity of the green color or the color itself does not change—rather, there is just more of the hydrogel. (*Id.* at 55)  John M. Tew, Jr., M.D. testified that in his experience, the color of the hydrogel does not influence him at all in determining thickness. (D.I. 403, ex. 5 at 25)  Instead, Dr. Tew relied on his judgment in determining whether the hydrogel was sufficiently applied. (*Id.* at 42)  At one point in his deposition, Mr. Shenouda testified that he "[doesn't] care which colour [the hydrogel turns] so long as it does the

---

undisputed that HyperBranch has 'selected a concentration of visualization agent for the polymer composition.'" (D.I. 465 at 11)  The Court agrees with Plaintiffs that in order to infringe the method of claim 20, one has to (1) formulate a polymer composition that comprises electrophilic functional groups and nucleophilic functional groups and (2) "select[] a visualization agent for the polymer composition" that, when deposited on the tissue of a patient, can cause a visually observable change that indicates that a crosslinked hydrogel having a predetermined thickness has been formed. (D.I. 465 at 11, 15)  But, as previously noted, claim 20 does not require that to perform the method, HyperBranch must execute the affirmative step of actually applying the hydrogel to tissue. (*Id.* at 15; Tr. at 26-28)

job, really." (D.I. 403, ex. 15 at 29)  Instead, as a "rule of thumb" he sprays the hydrogel "twice over the surface" and then stops.  (*Id.* at 30)  Likewise, Mr. Grundy testified at one point that he does not have in mind a specific color that he tries to match in order to determine that he has deposited a predetermined thickness of the Accused Products.  (*Id.*, ex. 14 at 41)

This testimony also indicates that there is an issue of fact as to whether HyperBranch has selected a concentration of visualization agent that, when deposited on the tissue of a patient, can cause a visually observable change that indicates that a crosslinked hydrogel having a predetermined thickness has been formed.

### (3)    Conclusion

In sum, a reasonable factfinder, taking the evidence in the light most favorable to one or the other of the parties (as there are cross-motions for summary judgment at issue here), could find for one or the other of the parties.  Therefore, there is a genuine dispute of material fact as to whether the Accused Products meet the predetermined thickness requirement of claim 20 of the '034 patent.[15]

### b.    The Remaining Predetermined Thickness Claims

With respect to the remaining predetermined thickness claims (i.e., claim 4 of the '566

---

[15]    The Court notes that while some of the evidence and arguments presented as to these motions could be said to relate to the Accused Products that utilize manual applicators (e.g., certain of the expert testing, and the video regarding the Adherus Spinal sealant), the bulk of what was presented appears directed to those Accused Products used with applicators that include the AutoSpray device (i.e., the Adherus AutoSpray Dural Sealant and Adherus AutoSpray Extended Tip (ET) Dural Sealant).  The parties did not really parse out which arguments are relevant to which products and which are not.  At times the answer seems self-evident (for example, the arguments regarding the presence of air bubbles relate to the products utilizing the AutoSpray device), at times, less so.  In any event, it appears to the Court that there are disputes of fact regarding infringement as to *all* of the Accused Products.

patent and claims 8 and 23 of the '418 patent), the parties incorporate the arguments that they made with respect to claim 20 of the '034 patent's predetermined thickness requirement. (D.I. 400 at 20, 22; D.I. 441 at 31, 32) Thus, for the reasons discussed above, genuine issues of material fact remain with respect to HyperBranch's infringement of these remaining predetermined thickness claims.

Accordingly, the Court need not (and will not) address the parties' arguments with respect to infringement of other elements of these claims. (D.I. 441 at 31-33; D.I. 465 at 16-17); *see, e.g.*, *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, C.A. No. 14-28-LPS, 2017 WL 134705, at *3 (D. Del. Jan. 12, 2017).

### 2.    Doctrine of Equivalents

Plaintiffs assert that—even assuming that the green dye in the Accused Products does not alone cause an observable change—the Adherus AutoSpray Dural Sealant and Adherus AutoSpray Extended Tip (ET) Dural Sealant products still infringe the Predetermined Thickness claims under the doctrine of equivalents ("DOE"). (D.I. 443 at 24; *see also* D.I. 429, ex. 76 at ¶ 91) In its Motion, HyperBranch too seeks summary judgment on this claim, asserting that Plaintiffs cannot rely on the DOE to establish infringement of these claims. (D.I. 402 at 3) According to HyperBranch, Plaintiffs have failed to establish a genuine issue of material fact on that front for two reasons: (1) Plaintiffs' DOE claims are barred by prosecution history estoppel; and (2) Plaintiffs have not established the required insubstantial differences between the alleged "visualization agent" equivalence of colorant dye (on the one hand) and colorant dye in combination with air bubbles (on the other). (D.I. 463 at 18-19; *see also* D.I. 402 at 38-40) The Court addresses each argument in turn.

26

### a.     Prosecution History Estoppel

The United States Court of Appeals for the Federal Circuit has explained that

"[p]rosecution history estoppel applies as part of an infringement analysis to prevent a patentee

from using the doctrine of equivalents to recapture subject matter surrendered from the literal

scope of a claim during prosecution." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d

1309, 1322 (Fed. Cir. 2013). "Estoppel arises when an amendment is made to secure the patent

and the amendment narrows the patent's scope." *Festo Corp. v. Shoketsu Kinzoku Kogyo*

*Kabushiki Co.*, 535 U.S. 722, 736 (2002); *see also Honeywell Int'l Inc. v. Hamilton Sundstrand*

*Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (prosecution history estoppel "bar[s] the patentee

from asserting equivalents if the scope of the claims has been narrowed by amendment during

prosecution").

When presented with a narrowing amendment that was made for reasons related to

patentability, the Court must "presum[e] that prosecution history estoppel applies." *EMD*

*Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1203 (Fed. Cir. 2014). The patentee may

rebut the presumption by establishing one of three exceptions to estoppel: "[t]he equivalent

[was] unforeseeable at the time of the application; the rationale underlying the amendment [bore]

no more than a tangential relation to the equivalent in question; or there [was] some other reason

suggesting that the patentee could not reasonably be expected to have described the

[equivalent]." *Festo*, 535 U.S. at 740-41. Whether prosecution history estoppel applies, and

therefore whether a patentee may assert the doctrine of equivalents for a particular claim

limitation, is a question of law. *Spectrum Pharms., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337

(Fed. Cir. 2015); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, C.A. No. 13-1632-LPS,

27

2017 WL 3723934, at *5 (D. Del. Aug. 29, 2017).

Here, Plaintiffs argue that prosecution history estoppel does not apply because the applicants' claim amendments at issue bear no more than a tangential relation to the equivalent in question (i.e., dye in combination with air bubbles). (D.I. 443 at 24) The tangentiality exception is "very narrow." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315 (Fed. Cir. 2008). That inquiry focuses on "the patentee's objectively apparent reason for the narrowing amendment." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003). To rebut the presumption of prosecution history estoppel with tangentiality, a patentee must demonstrate that "the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Honeywell Int'l*, 523 F.3d at 1315 (internal quotation marks and citation omitted). The reason for the narrowing amendment should be discernible from the prosecution history; if no reason is revealed therein, the presumption is not rebutted. *Id.* at 1315-16.

The original claim that issued as claim 16 of the '034 patent, from which claim 20 depends, is claim 28. Claim 28 originally recited:

> 28. (Original) A method for formulating a polymer composition that crosslinks to form a hydrogel, the method comprising selecting a concentration of visualization agent for the polymer composition that results in a visually observable change when the polymer composition is applied to a substrate at a predetermined thickness.

(D.I. 413, ex. 129 at HBMT0406637) Then the applicants amended the claim as follows, with the language added to the claim underlined:

> 28. (Currently Amended) A method for formulating a polymer composition that crosslinks to form a hydrogel, the method comprising selecting a concentration of visualization agent for the

28

> polymer composition ~~such~~ that ~~the visualization agent causes results in~~ a visually observable change ~~when the polymer composition is applied to a substrate at a predetermined thickness~~ ~~that indicates that a crosslinked hydrogel having a predetermined thickness has been formed on the tissue of a patient~~.

(D.I. 413, ex. 129 at HBMT0406699 (certain emphasis in original))  According to HyperBranch, the amendment added two significant narrowing limitations:  (1) "the visualization agent causes" a visually observable change and (2) that change "indicates that a crosslinked hydrogel having a predetermined thickness has been formed on the tissue of the patient."  (D.I. 402 at 38; *see also* D.I. 443 at 24 (Plaintiffs asserting that the amendment was to clarify that the "observable change" indicates "a cross-linked hydrogel having a predetermined thickness has been formed on the tissue of the patient" (internal quotation marks and citation omitted))

Plaintiffs assert that the tangentiality exception applies here because the amendment to the claim (set out above) "did not relate to whether the 'visualization agent' can be the combination of air bubbles and dye[,]" or anything approximating that.  (D.I. 443 at 24)  The Court agrees, as the prosecution history bears this out.

HyperBranch argues against this conclusion by stating that "Plaintiffs surrendered, through these claim amendments, everything except the 'visualization agent' from performing the claimed functions of this element."  (D.I. 463 at 20)  That is true, but here Plaintiffs' argument is that the combination of dye and air bubbles *serve as the relevant visualization agent*—the thing that causes an observable change at a predetermined thickness.  (*See, e.g.*, D.I. 429, ex. 76 at ¶ 91 (Dr. Mays opining that the Adherus AutoSpray and Adherus AutoSpray Extended Tip (ET) products infringe under the doctrine of equivalents "because the green dye combined with the air bubbles provide insubstantial differences in the manner in which they

serve as a visualization agent that helps to visualize the coating where there is an observable change that indicates a predetermined thickness for the hydrogel has been achieved")) The prosecution history does not suggest that in making the amendment, the patentee was asserting that only a visualization agent made up of colorant dye (and not air bubbles and dye, or some other combination) would be used in the invention.[16]

### b.    Asserted Equivalence

HyperBranch next argues that even if prosecution history estoppel does not apply, Plaintiffs' DOE claim is a nullity. Here, it argues that Plaintiff cannot show that there is an insubstantial difference between a visualization agent made up of a colorant dye and one amounting to a colorant dye in combination with air bubbles.

HyperBranch relies on the Predetermined Thickness claims' requirement that the "concentration" of "visualization agent" be "predetermin[ed]" or "select[ed]." (D.I. 402 at 39; D.I. 463 at 18-19) The Court construed the "predetermined concentration" limitation in claim 4 of the '566 patent to mean "amount of the substance or material in a particular volume determined in advance." (D.I. 307 at 45; D.I. 379 at 2) The other Predetermined Thickness claims require "selecting a concentration of visualization agent"—i.e., a selected amount of the substance or material in a particular volume. (*See* D.I. 402 at 39) HyperBranch's argument is that Dr. Mays failed to establish that the alleged equivalence of air bubbles combined with

---

[16]    The parties make similar arguments with respect to the '566 patent, (*see* D.I. 402 at 38-39; D.I. 443 at 25), regarding the patentee's amendment to claim 1, which added language clarifying that "wherein the visualization agent has a predetermined concentration that indicates a predetermined thickness of the hydrogel as deposited on the substrate[,]" (D.I. 418, ex. 174 at HBMT0407043 (emphasis omitted)). The Court reaches the same conclusion with respect to that patent.

colorant dyes could meet the claims' requirement that a concentration of visualization agent be predetermined/selected. (*Id.* at 39-40; D.I. 463 at 18) Dr. Lowman opined that he did not believe that Dr. Mays *could* establish this fact, since the amount of bubbles in the hydrogel could not be easily measured, and one could not "select[]" or "predetermin[e]" a concentration of bubbles as they are made during *application* of the hydrogel. (D.I. 403, ex. A at ¶¶ 423-24)

However, Dr. Mays responded by noting that the person of ordinary skill in the art is aware that standard air-assist spray applicators (such as those referenced in the '034 patent) can be used to apply the claimed hydrogels. (D.I. 429, ex. 76 at ¶ 93) The skilled artisan, according to Dr. Mays, is further aware that "air[-]assist sprayers are set to provide trapped air in an amount that does not affect the structural integrity of the hydrogel or otherwise cause defects in the hydrogels" and that the accused AutoSpray device is no different in that respect. (*Id.*) Thus, he opines that for purposes of the DOE, Plaintiffs need not show what the selected or predetermined concentration of bubbles need be—they just need to show that the combination of dye and air bubbles are equivalent to the claimed "visualization agent." (*Id.*)

In the Court's view, this seems like a factual dispute about whether the method/product at issue is equivalent to the claimed method/product, and drawing all reasonable inferences in the light most favorable to Plaintiffs, a reasonable jury could agree with either party on the issue. Therefore, genuine issues of material fact preclude summary judgment on the basis of the DOE with respect to the Predetermined Thickness claims. *See, e.g., W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, Civil Action No. 11-515-LPS-CJB, 2015 WL 12806483, at *11 (D. Del. Apr. 21, 2015) (same); *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609-10 (1950) (explaining that equivalence is a question of fact often requiring consideration of

"credibility, persuasiveness and weight of evidence").

**B.    Infringement Under 35 U.S.C. §§ 271(b), 271(c), and 271(f)**

Plaintiffs move for summary judgment that HyperBranch is liable under 35 U.S.C. §§ 271(b) and 271(c) for indirectly infringing claim 4 of the '566 patent, and liable for infringing claim 4 of the '566 patent under 35 U.S.C. §§ 271(f)(1)-(2) by supplying kits of components from its facility in North Carolina for combination abroad.    (D.I. 400 at 1-2; D.I. 465 at 20-22)   In order to prevail on their indirect infringement claims, Plaintiffs would have to demonstrate, *inter alia*, that HyperBranch directly infringes claim 4 of the '566 patent. *See, e.g., In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012).  However, the Court has concluded above that there are genuine issues of material fact on that front. Similarly, with respect to Plaintiffs' claims under Section 271(f), as explained above, there are genuine issues of material fact as to whether the Accused Products infringe claim 4 of the '566 patent that would be relevant to a decision as to whether HyperBranch is liable for export infringement (such as, for example, whether the concentration of visualization agent indicates that a predetermined thickness of the hydrogel has been deposited).  Thus, the Court recommends that summary judgment be denied with respect to Plaintiffs' claims of infringement under 35 U.S.C. §§ 271(b), 271(c), and 271(f).

**IV.    CONCLUSION**

For the reasons set forth above, the Court recommends that HyperBranch's Motion be DENIED and Plaintiffs' Motion, as it relates to the Predetermined Thickness claims, be

DENIED.[17]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1) and D. Del. LR 72.1. The parties may serve and file specific written objections by no later than **March 23, 2018**; responses are due by no later than **April 2, 2018**. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **March 16, 2018,** for review by the Court, along with a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

---

[17]    The Court recommends that Plaintiffs' Motion be granted as it relates to certain of HyperBranch's defenses. *See supra* n.3.

Dated:  March 13, 2018

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE